Benito T. PEREZ, Jr., Plaintiff–
Appellant,

v.

AETNA LIFE INSURANCE COMPANY,
Defendant–Appellee.

No. 95–1111.

United States Court of Appeals,
Sixth Circuit.

Argued March 14, 1996.

Decided Sept. 23, 1996.

Timothy A. O'Rourke, Hay & O'Rourke (argued and briefed), Lansing, MI, for Plaintiff–Appellant.

Jeffrey V. Stuckey, Richard D. McNulty, Dickinson, Wright, Moon, Van Dusen & Freeman (argued and briefed), Lansing, MI, for Defendant–Appellee.

Before: JONES, BOGGS, and COLE, Circuit Judges.

BOGGS, Circuit Judge.

Benito T. Perez, Jr. appeals from the district court's grant of summary judgment to the Aetna Life Insurance Company (Aetna), on his claim under the Employee Retirement Income Security Act (ERISA). We resolve a

split of authority among the district courts in the Sixth Circuit by joining those circuits holding that a *de novo* standard of review applies to both factual determinations and plan interpretation determinations made by an ERISA plan administrator, unless the plan clearly gives a particular kind of discretion to the administrator. Applying this standard of review, we reverse the district court's grant of summary judgment to Aetna.

## I

While working for the Motor Wheel Corporation, a division of Goodyear Tire and Rubber, Perez suffered a severe injury to his heel and ankle when he jumped from a platform to escape an explosion of molten steel. Before his injury, Perez had worked for Motor Wheel for 16 years. At the time of his accident, Perez had only a limited education—a General Educational Development (GED) diploma obtained while he was in the military. Even so, Perez was earning $40,000 per year in 1971 as a production foreman. His accident occurred on November 24, 1984. Pursuant to the "Group Insurance Policy/Long Term Disability Benefits" (Plan) that Goodyear Tire & Rubber had negotiated with Aetna for the benefit of Goodyear employees, Perez was determined to be completely disabled and was granted disability benefits under the Plan beginning in December 1985. Perez is now 52 years old.

Michigan law requires its residents who are receiving unemployment benefits to obtain retraining where possible.[1] In 1987, Perez, who was a feasible candidate for retraining at the community college level, entered a program leading to an associate's degree in business management from Lansing Community College. Perez's rehabilitation counselor sent Aetna a letter in which she noted that "[f]ollowing the completion of this program [for an associate's degree], job placement assistance will be provided until Mr. Perez has obtained employment." Perez did not obtain his degree until March 1991, two years behind schedule. Nevertheless, Aetna continued Perez's benefits through the entire period. Pursuant to a recommendation from his rehabilitation counselor, Aetna informed Perez on April 8, 1991 that his benefits would be extended for a period of job placement not to extend past June 30, 1991.

Perez enrolled in a computer training course on June 24, 1991 that was scheduled to last 12 weeks. In a March 18, 1992 letter from Mid–Michigan Rehabilitation Associates, a rehabilitation counselor discussed Perez's "Amended Vocational Rehabilitation Plan" as follows [2]:

> Initial job placement efforts revealed that Mr. Perez needed computer skills to compete for entry-level jobs in the business field. His Business Management program at Lansing Community College did not include computer skills training, and with his prior work history comprised primarily of factory work, Mr. Perez was not suitably prepared for an entry-level business position.

> Since mid-June, 1991, Mr. Perez has been involved with an individualized, hands-on computer skills training program with Smith & Bell Computer Training Institute, Inc. in Lansing, Michigan. Having no prior knowledge of the keyboard, Mr. Perez had to develop basic keyboarding skills and is now working to increase his speed. He is also involved with the Basic Word-Perfect instructional program and will then progress to Advanced WordPerfect and Lotus 1–2–3.

> Per Ms. Rosario's [an employee of Aetna's] request, a copy of the Amended Vocational Rehabilitation Plan was provided to her, which outlines the additional training that Mr. Perez needs. I also explained to Ms. Rosario that the training period would likely go beyond the 12–weeks [*sic*] that

1. Mich.Comp.Laws Ann. § 418.319(a) (West 1995). The terms of the Plan also seem to contemplate that retraining should take place by using the term "become fitted by ... training" in its definition of "reasonable occupation." Under the Plan, if a claimant can engage in a "reasonable occupation," he is no longer "disabled."

2. The district court and Aetna call this a "draft letter." It is unsigned, with only a typed name at the bottom.

the plan specifies because of Mr. Perez' lack of prior knowledge of the keyboard. The training program had to be further extended because of major medical problems experienced by Mr. Perez from December 1991 through March 1, 1992. . . .

In summary, it is my professional opinion that Mr. Perez was not yet competitively employable with the completion of his Associate Degree in Business Management. Had Mr. Perez already had employment experience in the business field in addition to possessing entry-level computer skills, he would have been much more readily employable following the completion of his degree in March 1991. However, in today's highly competitive job market, Mr. Perez is at a disadvantage without additional short-term training. It is my understanding that Mr. Perez' LTD [Long-Term Disability] Benefits were discontinued because of the assumption that he was employable with the Associate Degree in Business Management. However, for the reasons described above, Mr. Perez was not yet employable. Mr. Perez is working quite diligently in his computer skills program and has exhibited much enthusiasm for it. His vocational goal is customer service representative for a utility company or other similar business.

\* \* \* \* \* \*

Susan M. O'Malley, M.Ed., CRC, LPC
Rehabilitation Counselor

In response to Perez's requests for extension of his long-term disability benefits, Aetna wrote Perez on February 26, 1992 discontinuing his benefits:

You ... wrote us on September 9, 1991, and more recently on February 12, 1992. You are requesting an extension of Long-Term Disability benefit coverage in order that you may secure additional training and expertise involving the use of personal computers. You feel that this will enhance your marketability in job placement. We don't dispute that this additional training would be helpful but we feel that it is not essential in determining whether or not you presently have the training to pursue some reasonable occupation that others with the same training that you have are engaged in gainful work [sic]. We feel that you have acquired sufficient education and skills by virtue of your Associate of Arts Degree in Business Management and are now able to pursue some reasonable occupation. Therefore, we must refuse your request for extension of Long-Term Disability Benefits beyond June 30, 1991.

\* \* \* \* \* \*

Harvey McGee, Senior Analyst

McGee conceded at his deposition that he had no "particular vocational training," and would have to rely on Aetna's vocational expert, Leticia Rosario, in regard to such matters. Rosario stated in her deposition that she would defer to O'Malley's analysis of "whether or not Mr. Perez's capabilities in March of 1991 were competitive and marketable."

Concurrent with receiving benefits from Aetna, Perez collected Michigan worker's disability compensation benefits until December 5, 1992. On that day, he was offered employment at the Laboratory of Clinical Medicine of Michigan State University as a lab technician. He began to work there as a lab technician on December 7, 1992. He worked only one forty-hour week, then left work and never returned. Perez sought reinstatement of his worker's compensation benefits. An administrative hearing on this matter was held before a Michigan worker's compensation disability magistrate on October 6 and October 11, 1993. Perez's request for reinstatement was denied on November 16, 1993 because the magistrate believed that Perez simply did not like the lab job, probably because he was averse to working with blood samples and feared contracting AIDS as a result.

The Plan defines "[t]otal disability" and "totally disabled" as "during the twelve month qualifying period and thereafter during any one period of disability, that the employee is unable, solely because of disease, accidental bodily injury or a pregnancy-related condition to work at any reasonable occupation." "Reasonable occupation" is defined as "any gainful activity for which the employee is, or may reasonably become, fitted by education, training, or experience, and in

which other people of similar background are actually employed as their principal means of support." The Plan also requires that "[s]ubsequent written proof of the continuance of such disability must be furnished to [Aetna] at such intervals as [Aetna] may reasonably require.... [Aetna] shall have the right to require as part of the proof of claim satisfactory evidence ... (2) that [the claimant] has furnished all required proofs for such benefits...." The Plan notes that,

Subject to adjustment for error, the determination and findings made in good faith by the Policyholder[3] with respect to (1) the fact and time of commencement, duration and termination of an employee's employment, lay-off, leave of absence, or other absence from work, (2) the monthly rate of basic earnings of any employee, and (3) any fact relating to any retirement plan of a Participant Employer, shall be conclusive and binding upon all persons for the purposes of this policy.

Aetna partially based its conclusion that Perez was not disabled under the Plan on a medical evaluation by Dr. Sam Ho:

His current diagnosis will be including [sic] a calcaneous [sic] fracture, as well as triple arthrodesis.

He reported that he had the impairment [sic] of his recreation activity, although does not [sic] impair [sic] with his independence in self-care, daily activities. Based on my evaluation, patient is not completely unable to perform any occupation which they [sic] are reasonably suited by his education, training, or experience. His current treating physician has given him a restriction of no lifting for 25-lbs. [sic], as well as no prolonged period of ambulation. I feel he could work within the restriction. I feel the patient is most suited to perform a sedentary type of occupation which does not require prolonged [sic] period of ambulation and standing, and patient should be able to return to work at this time with this guideline.

Perez filed a complaint under ERISA § 502(a)(1)(b), 29 U.S.C. § 1132(a)(1)(b), against Aetna on March 11, 1994, arguing that Aetna had denied benefits due to him under the Plan. On September 15, 1994, Aetna moved for summary judgment under Fed.R.Civ.P. 56(b). On December 7, 1994, the district court granted summary judgment to Aetna, while denying Perez's cross-motion for summary judgment. The district court held that Aetna had correctly discontinued Perez's benefits under the Plan under either a *de novo* or "abuse of discretion" standard of review. The heart of the district court's opinion is set out below:

Plaintiff appears to argue that he had to be able to "find employment," or that he had to be "competitively" employable, as mentioned in a draft letter that plaintiff cites that was apparently written by Ms. O'Malley. These statements concern the fact that plaintiff would likely benefit from computer training, making him even more employable. However, nothing in the disability policy requires that plaintiff be competitively employable or be actually able to find a job. Therefore, even if computer training was necessary for plaintiff to obtain a job in the actual competitive environment, this would not constitute a "disability" triggering benefits under the policy. As noted above, he need only be shown to be able to perform jobs that other people with similar education, training, and experience are performing.

The district court also noted that Aetna's readiness to extend benefits to Perez during a three-month period after his graduation so that he could engage in job placement, as well as its patience during Perez's slow progress toward an associate's degree, showed that Aetna was not acting in bad faith in denying further benefits to Perez.

Perez filed a motion with the district court to alter or amend the judgment under Fed.R.Civ.P. 59(e) on December 21, 1994. The district court denied this motion on January 9, 1995, as well as denying Aetna's motion for

---

**3.** Aetna argues that "Policyholder" refers to Aetna itself. However, the "Policyholder" in this case is clearly the Goodyear Tire & Rubber Company, as the Plan indicates. Aetna is referred to as the "Insurance Company" throughout the

Plan. The term "Participant Employer" is also used throughout the Plan, but this likely refers to companies like Motor Wheel, Perez's former employer, which is a sub-division of Goodyear, not to Goodyear itself.

attorneys fees and costs. Perez filed a timely notice of appeal from the district court's grant of summary judgment to Aetna and from its denial of his motion to alter the judgment.

## II. STANDARD OF REVIEW FOR RULE 59(e) MOTIONS

■ Denials of motions to alter or amend a judgment under Rule 59(e) are typically reviewed for abuse of discretion. But, where an appeal of the denial of such a motion is conjoined with an appeal from summary judgment, the same standard of review applicable to the district court's disposition of the summary judgment motion should be employed in reviewing the Rule 59(e) motion. *Columbia Gas Transmission v. Limited Corp.*, 951 F.2d 110, 112 (6th Cir.1991) (when a Rule 59(e) motion is being reviewed along with a grant of summary judgment, *de novo* standard of review should be applied). Thus, when a party appealing from the denial of a Rule 59(e) motion is also appealing from either a grant or denial of summary judgment, the court does not review the denial of the Rule 59(e) motion separately.

■ In this case, because we must address a grant of summary judgment, we will employ a *de novo* standard of review. *Parrett v. American Ship Building Co.*, 990 F.2d 854, 858 (6th Cir.1993). The text of Rule 56(c) requires this court to determine whether there are any "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." In making this determination, the court cannot resolve issues of fact, but must decide only whether there are issues in dispute to be determined in a trial on the merits. *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987). All reasonable inferences must be drawn from the facts in favor of the non-

moving party, which in this case is the plaintiff, Perez. *Parrett*, 990 F.2d at 858. A "mere ... scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which [a] jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

## III. COLLATERAL ESTOPPEL

■ Aetna argues that because a worker's compensation magistrate in Michigan specifically found after a two-day hearing that Perez could and did perform work at the Michigan State University's Laboratory of Clinical Medicine, Perez should be collaterally estopped from challenging Aetna's denial of additional ERISA benefits. It is difficult for us to consider Aetna's argument for collateral estoppel, because the district court did not address it in its opinion. "In general, an appellate court will not address issues on appeal that were not ruled upon below." *Maldonado v. National Acme Co.*, 73 F.3d 642, 648 (6th Cir.1996) (applying this rule to a claim for collateral estoppel).[4] Aetna contends that where summary judgment was correctly granted such a grant can be affirmed, even if for different reasons than those relied upon by the district court, citing *USA Petroleum Co. v. Atlantic Richfield Co.*, 13 F.3d 1276, 1279 (9th Cir.1994). While a grant of summary judgment can typically be affirmed on different grounds, collateral estoppel is not such a ground, as *Maldonado* shows. *Maldonado* involved the review of a grant of summary judgment by a district court, but held nevertheless that collateral estoppel could not be addressed by our court unless it was raised below.

---

4. For a forceful argument that courts of appeals should be able to raise preclusion issues sua sponte, even when the defendant did not plead them affirmatively in accordance with Fed. R.Civ.P. 8(c), see *Agg v. Flanagan*, 855 F.2d 336, 344 (6th Cir.1988) (Contie, J., dissenting) (noting that the Court of Claims, the Eighth and Ninth Circuits, and even the Sixth Circuit in a per curiam opinion, had either addressed preclusion issues sua sponte or permitted a district court to

raise preclusion issues sua sponte). The Second and Seventh Circuits also hold to the view espoused by Judge Contie's dissent in *Agg. See Studio Art Theatre of Evansville, Inc. v. City of Evansville*, 76 F.3d 128, 130 (7th Cir.1996) (also noting that Second Circuit allows its district courts to raise preclusion issues sua sponte, citing *Salahuddin v. Jones*, 992 F.2d 447, 449 (2d Cir.), *cert. denied*, 510 U.S. 902, 114 S.Ct. 278,

There is an exception to the general rule that the Sixth Circuit will not consider an issue not decided below, however, where "the proper resolution is beyond doubt" or "injustice might otherwise result." *Meade v. Pension Appeals & Review Comm.*, 966 F.2d 190, 194 (6th Cir.1992). This is an extremely narrow exception that we infrequently invoke. We choose not to invoke it here because Aetna's state law-based argument for the application of collateral estoppel is doubtful.

It is true, as Aetna points out, that in non-diversity cases the federal law of collateral estoppel controls. *Blonder–Tongue Labs., Inc. v. University of Ill. Found.*, 402 U.S. 313, 324 n. 12, 91 S.Ct. 1434, 1440 n. 12, 28 L.Ed.2d 788 (1971). But federal law directs us to consult state law for the defining standards of preclusion where the prior judgment rests on state law. *See Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 382, 105 S.Ct. 1327, 1332, 84 L.Ed.2d 274 (1985) (in a federal antitrust case, 28 U.S.C. § 1738 [5] required that an earlier state court judgment be given the same preclusive effect that it would be given by a court of that state); *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984) (same when federal claim based on 42 U.S.C. § 1983); *Stuhlreyer v. Armco, Inc.*, 12 F.3d 75, 77 (6th Cir.1993) (same; ERISA claim); *Gutierrez v. Lynch*, 826 F.2d 1534, 1537 (6th Cir.1987) (same; § 1983 claim). *See generally* Romualdo P. Eclavea, Annotation, *State or Federal Law as Governing Applicability of Doctrine of Res Judicata or Collateral Estoppel in Federal Court Action*, 19 A.L.R. Fed. 709 § 4 (1974 & Supp.1995). *Cf. United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) (federal common law governing contractual liens arising from federal loan program incorporated state common law). The only exception to this doctrine occurs where the statute on which the federal cause of action is based constitutes an express or implied repeal of § 1738. We find no evidence of such a repeal in ERISA.

Though we are not required to do so by the text of § 1738, federal common law requires us to give preclusive effect to the determinations of a state administrative agency acting in a judicial capacity. *University of Tennessee v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986) (holding that federal courts must utilize the same preclusion doctrine as would be applied by a state court to administrative determinations by that state); *Nelson v. Jefferson County, Ky.*, 863 F.2d 18, 19 (6th Cir.1988) (same), *cert. denied*, 493 U.S. 820, 110 S.Ct. 76, 107 L.Ed.2d 42 (1989).

While federal law does not require mutuality between the parties, *Parklane Hosiery v. Shore*, 439 U.S. 322, 326–27, 99 S.Ct. 645, 649–50, 58 L.Ed.2d 552 (1979), some states do require mutuality. Michigan courts require mutuality of parties before giving issue-preclusive effect to a determination made by a Michigan state agency. *Nummer v. Treasury Dep't*, 448 Mich. 534, 533 N.W.2d 250, 253 (setting forth the requirements for giving issue-preclusive effect to administrative determinations and noting that mutuality is required), *cert. denied*, —— U.S. ——, 116 S.Ct. 418, 133 L.Ed.2d 335 (1995). *But see Knoblauch v. Kenyon*, 163 Mich.App. 712, 415 N.W.2d 286, 291 (1987) (arguing that in *Imperial Kosher Catering, Inc. v. The Travelers Indemnity Co.*, 73 Mich.App. 543, 252 N.W.2d 509 (1977), the Michigan Supreme Court had abandoned the mutuality requirement at least as it applied to defensive collateral estoppel (when a defendant uses collateral estoppel as a shield, not where a plaintiff uses it as a sword)). It is likely that *Nummer*, being the more recent pronouncement of the Michigan Supreme Court on the subject, correctly summarizes the law of Michigan, *Knoblauch* not withstanding. Even if this were not correct, however, the diver-

---

126 L.Ed.2d 229 (1993)), *cert. denied*, —— U.S. ——, 117 S.Ct. 177, —— L.E.2d —— (1996).

**5.** Section 1738 is the statutory counterpart of the constitutional Full Faith and Credit Clause, which applies only to the states. It reads as follows:

[The] Acts, records and judicial proceedings or copies thereof, so authenticated, [of any State Territory or Possession] shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

gence of the two cases indicates that the law on whether mutuality is required in Michigan is not "beyond doubt" as *Meade* requires. Therefore, since Aetna was not a party to the Michigan worker's compensation proceeding where a magistrate determined that Perez could and did work, and since mutuality is or may be a requirement under Michigan law, we cannot hold that it is beyond doubt that a Michigan court would give that administrative determination preclusive effect. Such certainty is required before we will address a collateral estoppel argument not dealt with by the district court below unless justice requires otherwise. As our resolution of the merits of this case below demonstrates, the equities here lie with Perez. Therefore, we refuse to resolve definitively the merits of Aetna's collateral estoppel argument.

## IV. STANDARD OF REVIEW APPLICABLE TO DECISIONS BY AN ERISA PLAN ADMINISTRATOR

In the course of deciding whether to continue paying benefits under the Plan to Perez, however, Aetna needed to determine whether Perez was "disabled" under the Plan. Factual findings of this nature by a plan administrator can, under certain circumstances, be given a measure of deference by a federal court under *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). *Bruch* holds that where an ERISA plan administrator is explicitly given discretionary authority to determine eligibility for benefits or to construe the terms of an ERISA plan, then an abuse of discretion standard of review applies, although in all other circumstances a *de novo* standard of review should apply. The district court did not reach the issue of whether a *de novo* standard or an abuse of discretion standard applies in this case because it thought that whatever standard of review was applied the same result would obtain. In order to reach this issue, we must conclude that if a *de novo* standard of review were applied, we would reverse the district court. Since we think such a conclusion can be reached in this case, as we will demonstrate below in Section VI, we must decide whether a *de novo* or abuse of discretion standard of review applies here.

The parties dispute whether *Bruch* requires that the *de novo* standard of review must be applied to *factual determinations* made by a plan administrator, when an ERISA plan does not explicitly give its administrator discretionary authority to determine general benefits eligibility by making fact determinations. Aetna argues that *Bruch* only requires that the *de novo* standard of review be applied to the plan administrator's *interpretation of the terms* of an ERISA plan when an ERISA plan does not specifically confer this interpretive power. In Aetna's view, an ERISA plan administrator would always retain the power to make factual determinations absent, presumably, an express abnegation of this power in the terms of the plan. Perez argues that an ERISA plan must explicitly grant the power to make factual determinations, just as the plan must explicitly grant the power to interpret the provisions of the plan, to the plan administrator. Otherwise, Perez argues, *Bruch* requires that a *de novo* standard of review be applied to any factual determinations made by the plan administrator.

There is a circuit split on this issue. *Compare Pierre v. Connecticut Gen. Life Ins. Co.,* 932 F.2d 1552, 1559 (5th Cir.1991) (abuse of discretion review always applies to factual determinations made by a plan administrator), *cert. denied,* 502 U.S. 973, 112 S.Ct. 453, 116 L.Ed.2d 470 (White & Blackmun, JJ., dissenting) *with Luby v. Teamsters Health, Welfare, and Pension Trust Funds,* 944 F.2d 1176, 1183–84 (3d Cir.1991) (*de novo* review applies to factual determinations made by a plan administrator unless the plan administrator has been explicitly given discretionary authority to determine eligibility for benefits); *Reinking v. Philadelphia Amer. Life Ins. Co.,* 910 F.2d 1210, 1214 (4th Cir.1990) (applying *de novo* review to factual determination without addressing controversy over how to interpret *Bruch* ), *overruled on other grounds by Quesinberry v. Life Ins. Co. of N. Amer.,* 987 F.2d 1017 (4th Cir.1993) (en banc); *Petrilli v. Drechsel,* 910 F.2d 1441, 1446 (7th Cir.1990) (noting in dicta that the Supreme Court's statement of its holding in *Bruch* "strongly suggests" that the Court

intended to require the application of *de novo* review if a plan administrator had not been explicitly given the relevant type of discretion, regardless of whether interpretative or factual determinations were being reviewed).

Moreover, the district courts within the Sixth Circuit are also split. *Compare Moshin v. John Hancock Mut. Life Ins. Co.*, C.A. No. 88–CV–60415–AA (E.D.Mich. Nov. 27, 1989) (La Plata, J.) (applying arbitrary and capricious standard of review because plaintiff's claim involved only a factual determination)[6]; *Fauver v. The Travelers Indemnity Co. of R.I.*, Civ. Action No. 90–CV–40118–FL (E.D.Mich. Nov. 27, 1990) (Newblatt, J.) (canvassing the law in the area and concluding in dicta that abuse of discretion review always applies to factual determinations made by a plan administrator) *with Donaldson v. Metropolitan Life Ins. Co.*, 812 F.Supp. 103, 105 n. 5 (E.D.Mich.1993) (Zatkoff, J.) (*de novo* standard of review applies to ERISA benefit denials based on either plan interpretation or purely factual determinations, absent an explicit grant of discretionary authority to the plan administrator); *Reynolds v. Massachusetts Casualty Ins. Co.*, 900 F.Supp. 915, 924 n. 8 (E.D.Tenn. 1995) (same, rejecting defendant's invocation of the Fifth's Circuit's *Pierre* decision).

The Sixth Circuit has not squarely addressed this issue before. Nevertheless, conflict exists between dicta in certain Sixth Circuit cases and the results of other Sixth Circuit cases. *Compare Davis v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689, 693–94 (6th Cir.1989) (possibly limiting, in dicta, *de novo* review to plan interpretation issues by portion of *Bruch* it chose to quote; *Davis*'s dicta seems to have led to the *Moshin* decision summarized above), *cert. denied*, 495 U.S. 905, 110 S.Ct. 1924, 109 L.Ed.2d 288 (1990); *Aubrey v. Aetna Life Ins. Co.*, 886 F.2d 119, 122 (6th Cir.1989) (same) *with Anderson v. Great West Life Assur. Co.*, 942 F.2d 392, 395 (6th Cir.1991) (plan administrator can be given discretionary authority with respect to some decisions, but not others; unless discretionary authority clearly granted, *de novo* standard of review must be

applied); *Brown v. Ampco–Pittsburgh Corp.*, 876 F.2d 546, 550 (6th Cir.1989) (applying *de novo* standard of review to factual determination without noting controversy over this choice).

This dispute over the breadth of *Bruch* results because Justice O'Connor's opinion in that case stated the question presented in a very limited fashion at one point: "The discussion which follows is limited to the appropriate standard of review in [29 U.S.C.] § 1132(a)(1)(B) actions challenging denials of benefits *based on plan interpretations*." *Bruch*, 489 U.S. at 108, 109 S.Ct. at 953 (emphasis added). Aetna and the Fifth Circuit in *Pierre* take this language to mean that the ultimate holding of the case, requiring *de novo* review to be applied to benefit denials where a plan does not explicitly grant the plan's administrator discretionary authority to make benefits determinations, is limited to "plan interpretations" only. Thus, the implicit limitation on the holding of *Bruch* that Aetna urges this court to adopt is that fact determinations made by a plan administrator are outside of *Bruch*'s holding, and thus become subject to abuse of discretion or arbitrary and capricious review.

Looking to the facts of *Bruch*, to the language the Supreme Court used elsewhere in the case, and to the case's reasoning, the argument made by Aetna is weak. In *Bruch*, employees who were terminated by their former employer and rehired by a successor corporation brought suit under ERISA § 1132(a)(1)(B) against that corporation to obtain severance benefits they alleged were wrongfully denied them by their former employer. Their former employer argued that the employees were not terminated because of a "reduction in work force" and therefore under the terms of the Plan the employees were not entitled to severance benefits. The Third Circuit held that the former employer's denial of severance benefits was to be reviewed *de novo* because, in situations where an employer is the plan administrator, deference is unwarranted given the lack of impartiality on the employer's part. Because the ERISA plan at issue did

---

**6.** Aetna represents that *Moshin* was affirmed by the Sixth Circuit, but an appeal from this deci-

sion was in fact voluntarily dismissed by stipulation of the parties involved.

not give the former employer discretion to make benefits determinations, the Supreme Court held that *de novo* review was appropriate, but it noted that the impartiality of a plan administrator could be considered when it becomes necessary to apply abuse of discretion review. The Court disagreed with the Third Circuit's use of impartiality as a factor to be employed in making the determination of whether the terms of an ERISA plan require the application of *de novo* or abuse of discretion review.

The Court rejected the argument that the background principles of trust law that inform ERISA require that abuse of discretion review always be applied to challenges based on allegedly improper denials of benefits under § 1132(a)(1)(B). "As they do with contractual provisions, courts construe terms in trust agreements without deferring to either party's interpretation." *Bruch*, 489 U.S. at 112, 109 S.Ct. at 955. In short, the Supreme Court's rationale for rejecting the plan administrator's argument in *Bruch* was that a trust, and therefore an ERISA plan, was like any other contract—courts should not give any deference to either party's interpretation of the contract, unless the terms of the contract itself required that such deference be shown.

> Actions challenging an employer's denial of benefits before the enactment of ERISA were governed by principles of contract law. If the plan did not give the employer or administrator discretionary or final authority to construe uncertain terms, the court reviewed the employee's claim as it would have any other contract claim—by looking to the terms of the plan and other manifestations of the parties' intent.

*Id.* at 112–13, 109 S.Ct. at 955. "Adopting [the employer's] reading of ERISA would require us to impose a standard of review that would afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted." *Id.* at 113–14, 109 S.Ct. at 956.

Under the Supreme Court's reasoning, the argument by Aetna and the Fifth Circuit that *Bruch* does not require the application of *de novo* review to factual determinations made by plan administrators in the absence of a grant of discretionary authority to the plan administrator is puzzling. Facts relating to the interpretation of both trust and non-trust contracts cannot be determined by one of the parties to that trust or contract dispute, unless that power is explicitly given in the trust or contract. The baseline principle of our system of law is that *courts* resolve disputes about contracts, trusts, and ERISA plans, whether those disputes are factual or based on the terms of the relevant instrument. Moreover, the Supreme Court, in its brief survey of trust and contract law in *Bruch*, did not distinguish between the appropriateness of deference to factual findings and the interpretation of the terms of a contract or trust.

The reasoning in the Fifth Circuit's *Pierre* decision to the contrary is conclusory. The *Pierre* court first noted that as a policy matter it would not be inconceivable to apply different standards of review to factual determinations and interpretations of a plan's language. *Pierre*, 932 F.2d at 1557–59. The court then concluded that, "[t]he courts simply cannot supplant plan administrators, through de novo review, as resolvers of mundane and routine fact disputes." *Id.* at 1559. Here, the Fifth Circuit appears to be arguing that resolving factual disputes in ERISA cases would be too wasteful an exercise for a federal court to engage in. Much the same could be made in many of the diversity cases that the federal courts are required to hear, however. This argument ignores the lesson of *Bruch*, which is that an employee cannot be forced to accept the resolution of "mundane and routine fact disputes" about benefit eligibility made by the plan administrator, unless the plan itself grants this discretionary authority to the plan administrator. The *Pierre* court's argument proves too much because if accepted it would require the federal courts to grant deference to any mundane factual determination made by one party to a contract, even if the contract did not give fact-finding power to one of the parties.

The *Pierre* court also noted that the factual determinations at a prior stage of litigation are usually reviewed deferentially by federal courts. *Id.* at 1558. This, of course, is true, but the reason for applying deference in such

824

circumstances is either that the courts of appeals are reviewing the district courts in their capacity as finders of fact, or that the federal courts are reviewing administrative agencies engaging in a similar function. Deferring under these circumstances is very different than deferring to a plan administrator, who will be one party to a private dispute, when that administrator is purporting to act as a fact-finder under a plan that does not explicitly grant such authority. The baseline principle is that a federal court cannot be expected to defer to a plan administrator in such situations. The reason for treating the two situations differently is obviously that one party to a contract has an incentive to find facts not in a neutral fashion, but in the manner that is most advantageous to its own interests. The Supreme Court rejected similar reasoning by the Third Circuit in *Bruch* only insofar as the Third Circuit seemed to be saying that *de novo* review would apply even when a plan explicitly gave interpretive or fact-finding power to a plan administrator. Obviously, if a trust's terms give fact-finding power to a plan administrator, a federal court must respect that allocation of authority regardless of whether, once such terms are in place, the plan administrator could use the fact-finding power to its own advantage. An ERISA plan with a term in it granting discretionary authority to the plan administrator to find facts or to interpret the language of the plan may be worth less to an employee than a plan that does not include a grant of such discretionary authority. The ability to take even a "mundane and routine" factual dispute to a federal court for resolution is obviously valuable to employees. To strip this

value out of an ERISA plan is to "afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted." *Bruch*, 489 U.S. at 114, 109 S.Ct. at 956.

The *Pierre* court relied on certain aspects of the legislative history of ERISA even while recognizing that reliance on this legislative history had been rejected by the Supreme Court in *Bruch*: "We acknowledge that the Supreme Court in *Bruch* rejected these justifications for plan term interpretations. We believe, however, that in the area of reviewing factual determinations, these justifications for a deferential standard of review remain valid and compelling." *Pierre*, 932 F.2d at 1558 n. 8. The Supreme Court, however, found the same legislative history cited in *Pierre* less than compelling because it was subsequent legislative history—"[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Bruch*, 489 U.S. at 114, 109 S.Ct. at 956 (quoting *United States v. Price*, 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960)). There is no reason to limit this rationale only to congressional intent with respect to plan interpretation issues. Its general applicability forces the conclusion that it was intended to cover fact-finding determinations.

The most significant argument of the *Pierre* court is that 29 U.S.C. §§ 1102(a)(1) [7] and 1133(2) [8], in conjunction with the Restatement (Second) of Trusts § 186 [9], mean that fact-finding by a plan administrator should always receive deferential review. *Pierre*, 932 F.2d at 1557–58. We first examine the court's argument from the Restate-

7. 29 U.S.C. § 1102(a)(1) provides as follows:
Every employee benefit plan shall be established and maintained pursuant to a written instrument. Such instrument shall provide for one or more named fiduciaries who jointly and severally shall have the authority to control and manage the operation and administration of the plan.

8. 29 U.S.C. § 1133 provides, in relevant part:
In accordance with the regulations of the Secretary, every employee benefit plan shall—
＊　　＊　　＊　　＊　　＊　　＊
(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the

appropriate named fiduciary of the decision denying the claim.

9. Restatement (Second) of Trusts § 186 provides as follows:

Except as stated in §§ 165–168, the trustee can properly exercise such powers and only such powers as
(a) are conferred on him in specific words by the terms of the trust, or
(b) are necessary and appropriate to carry out the purposes of the trust and are not forbidden by the terms of the trust.

ment. Section 186 of the Restatement does not provide any support for *Pierre*'s conclusion. The *Pierre* court focuses on § 186(b), which uses the phrase "necessary and appropriate," for the purpose of contending that fact-finding is a necessary and appropriate power for an ERISA plan administrator to possess. This argument · ignores the Supreme Court's focus in *Bruch* on the point of law expressed in § 186(a) of the Restatement, which notes that a trustee lacks powers unless they are specifically conferred. We do not understand why it "necessary" for a plan administrator to have the discretionary power to determine facts when disputes arise relating to the ERISA plan being administered. Moreover, the plan administrator's § 186(b) powers only exist to "carry out the purposes of the trust" and must not be "forbidden by the terms of the trust." We read these limitations in conjunction with § 186(a), which requires "specific words" in the trust conferring a particular power on the trustee. Section 186(b) confers all means necessary to achieve the powers specifically conferred on a plan administrator, but it does not grant the plan administrator entirely new powers. The power to determine facts in the first instance is significant enough to require an express grant in the terms of the plan. *Pierre* cites no cases to support its novel reading of § 186(b).

Therefore, the *Pierre* court is left with its arguments from 29 U.S.C. §§ 1102(a)(1) and 1133(2). Similarly, the *Pierre* court provides no citations to support its conclusion that the "authority to control and manage the operation and administration of the plan" or "full and fair review" includes the power to find facts. Most importantly, the Supreme Court rejected arguments from both of these statutory provisions in *Bruch:* "But the provisions relied upon so heavily by [the plan adminis-

trator] do not characterize a fiduciary as one who exercises entirely discretionary authority or control. Rather, one is a fiduciary to the extent he exercises any discretionary authority or control." *Bruch,* 489 U.S. at 113, 109 S.Ct. at 955–56. Again, the touchstone of the analysis in *Bruch* is the terms of the plan and the discretion it explicitly grants or fails to grant to the plan administrator.

We reject the conclusion and reasoning of *Pierre*. We join every other circuit that has either explicitly or implicitly addressed this question. *Bruch* does not distinguish between fact-finding and plan term interpretation. "Consistent with established principles of trust law, we hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits [fact-finding] or to construe the terms of the plan [plan interpretation]." *Bruch,* 489 U.S. at 115, 109 S.Ct. at 956–57.

## V. THE PLAN DOES NOT GIVE AETNA DISCRETIONARY AUTHORITY

■■■ Perhaps recognizing the problems with its reliance on *Pierre*, Aetna argues that it has been explicitly given discretionary authority in the Plan to make benefits determinations. To support this claim, Aetna points to the following language in the Plan: "[s]ubsequent written proof of the continuance of such disability must be furnished to [Aetna] at such intervals as [Aetna] may reasonably require . . . . [Aetna] shall have the right to require as part of the proof of claim satisfactory evidence . . . (2) that [the claimant] has furnished all required proofs for such benefits." [10] It is true that "[t]he Court in *Firestone [v. Bruch ]* surely did not suggest that

---

10. We note that the following provision in the Plan, also cited by Aetna, provides no support for its argument:

> Subject to adjustment for error, the determination and findings made in good faith by the Policyholder with respect to (1) the fact and time of commencement, duration and termination of an employee's employment, lay-off, leave of absence, or other absence from work, (2) the monthly rate of basic earnings of any

employee, and (3) any fact relating to any retirement plan of a Participant Employer, shall be conclusive and binding upon all persons for the purposes of this policy.

As discussed *supra*, p. 818 & n. 3, Aetna is not the "Policyholder" and therefore this provision, which gives conclusive power to Goodyear to determine certain facts not relevant here, offers no basis for arguing that Aetna has been given any discretionary authority either to interpret the Plan or to make benefits determinations.

'discretionary authority' hinges on incantation of the word 'discretion' or any other 'magic word.' Rather, the Supreme Court directed lower courts to focus on the breadth of the administrators' power—their 'authority to determine eligibility for benefits or to construe the terms of the plan.'" *Block v. Pitney Bowes, Inc.,* 952 F.2d 1450, 1453 (D.C.Cir.1992) (quoting *Bruch,* 489 U.S. at 115, 109 S.Ct. at 956–57). However, the plain meaning of the provisions Aetna cites from the Plan does not give it discretionary authority. First, simply because Aetna has the ability to require written proof before continuing disability benefits does not mean that Aetna has the discretionary authority to decide whether that proof is sufficient within the meaning of the Plan. Second, simply because Aetna may require "satisfactory proof" does not give the insurance company discretionary authority, either. The quoted Plan provision does not specify to whom the proof should be satisfactory. Perez is probably correct in arguing that this language creates an objective standard—proof "satisfactory" to a reasonable person. But all we need decide at this point is that the language does not clearly give Aetna discretion, which is what the language of an ERISA plan must do under *Bruch* to trigger abuse of discretion review.

To overcome this commensensical conclusion, Aetna cites a number of cases, all of which are distinguishable. *See Donato v. Metropolitan Life Ins. Co.,* 19 F.3d 375, 379–80 (7th Cir.1994) ("all proof must be satisfactory to us"); *Wildbur v. ARCO Chem. Co.,* 974 F.2d 631, 637 (5th Cir.1992) (plan allowed administrator to "make an independent determination of the applicant's eligibility for benefits under the Plan" and noted that the administrator's decision "shall be final and conclusive upon all persons. . . ."); *Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 983 (6th Cir.1991) (plan used the phrase "on the basis of medical evidence satisfactory to the Company"); *Sisters of the Third Order of St.*

*Francis v. SwedishAmerican Group Health Benefit Trust,* 901 F.2d 1369, 1371 (7th Cir. 1990) (plan gave committee power to "construe and interpret the Plan [and] decide all questions of eligibility") [11]; *Davis,* 887 F.2d at 694 (plan used the phrase "[i]n case of any factual dispute hereunder, the Retirement Committee shall resolve such dispute giving due weight to all evidence available to it"); *de Nobel v. Vitro,* 885 F.2d 1180, 1186–87 (4th Cir.1989) ("the Committee shall have such powers . . . including . . . the power . . . [t]o determine all benefits and resolve all questions pertaining to the administration, interpretation and application of Plan provisions, either by rules of general applicability or by particular decisions"); *Bali v. Blue Cross and Blue Shield Assoc.,* 873 F.2d 1043, 1047 (7th Cir.1989) ("'disabled' means that a Participant is, determined on the basis of medical evidence satisfactory to the Committee, wholly prevented, by reason of mental or physical disability, from engaging in any occupation"); *Kiley v. The Travelers Indemnity Co. of R.I.,* 853 F.Supp. 6, 11 (D.Mass. 1994) (plan used the phrase "the Employee shall be assumed to be totally disabled if because of disability he is unable (as determined by the Company) to perform the normal duties of his regular occupation"). Aetna also cites *Pressley v. Metropolitan Life Ins. Co.,* 729 F.Supp. 570, 572 n. 1 (E.D.Mich. 1990), but it is not possible to know why the *Pressley* court concluded that discretion existed, as the exact language of the plan was not quoted in its opinion. Moreover, even if vague language was held in *Pressley* to confer discretionary authority upon a plan administrator to resolve factual disputes, that district court result is not persuasive in the face of substantial contrary authority from the courts of appeals and other district courts.

In response to Perez's argument that the cases Aetna has cited are clearly distinguishable from this case, because the language of the plans considered in those cases was dif-

---

**11.** *Sisters of the Third Order* holds that under either an abuse of discretion or *de novo* standard of review a claimant could not prevail because of a provision in the relevant ERISA plan barring recovery of benefits for injuries that occurred while engaging in illegal activity. The intoxicat-

ed claimant in *Sisters of the Third Order* was injured while driving an automobile. This case does not hold that the language of the ERISA plan at issue was sufficiently clear to confer discretion on the plan administrator in light of *Bruch,* however.

ferent and much clearer, Aetna ironically claims that Perez provides no authority for this conclusion. If Aetna means that Perez cited no cases holding that language similar to its Plan failed to confer discretionary authority, then Aetna is undoubtedly correct. However, *Bruch* requires that discretion must be granted in an ERISA plan in order for abuse of discretion review to apply. A court determines whether discretion has been granted by reading the plan. Reading the Plan in this case leads to the ineluctable conclusion that discretion was not granted. Thus, Perez needs no more authority to make this point than *Bruch* itself. Perez is not arguing that the Plan did not use the magic word "discretion;" he is arguing that it did not use any words to indicate clearly that fact-finding discretion was being granted to Aetna.

We conclude that based on the language of the Plan at issue in this case a *de novo* standard of review is applicable to Aetna's decision to discontinue Perez's benefits under the Plan.

## VI. APPLICATION OF *DE NOVO* STANDARD OF REVIEW

■ The Plan defines "Total disability" and "totally disabled" as "during the twelve month qualifying period and thereafter during any one period of disability, that the employee is unable, solely because of disease, accidental bodily injury or a pregnancy-related condition to work at any reasonable occupation." Other than the determination of whether he is "unable ... to work at any reasonable occupation" because of his injury, it is obvious Perez meets the requirements of this provision. "Reasonable occupation" is defined as "any gainful activity for which the employee is, or may reasonably become, fitted by education, training, or experience, and in which other people of similar background are actually employed as their principal means of support." Aetna concedes that Perez was unsuited before he completed his

associate's degree for any "reasonable occupation." The crux of the case is therefore whether, after he obtained his associate's degree (after he became "fitted by education"), Perez was able to engage in some gainful activity "in which other people of similar background are actually employed as their principal means of support."

■ The plain meaning of the requirement that Perez be able to engage in gainful activity "in which other people of similar background are actually employed as their principal means of support" is that Perez: (1) be capable of working at a job where individuals with similar education, training, or experience were actually working; and (2) that such jobs provide the principal means of support for such individuals. This is because the referent of the term "background" is "education, training, or experience." Thus, Perez's argument that Aetna would have to show that someone with an associate's degree from Lansing Community College who had the same injuries Perez had to his or her heel and ankle was working as, for example, a customer service representative at a bank must be rejected. "Background" does not refer to a similar physical or mental impairment, but, in context, refers to similar education, training, or experience. Perez's suggestion at various points throughout his briefs that "reasonable occupation" requires him to be able to find a job comparable perhaps in salary and status to his former employment at Motor Wheel is also without support in the Plan language.[12]

■ The district court's assessment of the Plan's "reasonable occupation" language has its own difficulties: "However, nothing in the disability policy requires that plaintiff be competitively employable or be actually able to find a job." While it is true that the language in the Plan does not mandate that Perez actually find a job, it does mandate, contrary to what the district court stated, that Perez *be able* to find a job. If Perez

**12.** Moreover, although irrelevant from a legal standpoint, it is relevant from an equitable standpoint that Perez was entitled to receive from his former employer under Michigan law 80% of the difference between the salary of any job he now obtains and his salary on the date of his injury.

Mich.Comp.Laws Ann. § 418.301(5)(b) (West 1995). Maximum benefits received under this provision, however, could not have exceeded the maximum weekly rate of compensation as determined in Mich.Comp.Laws Ann. § 418.335 (West 1995).

were not able to find a job, then he would not be "fitted" to engage in some "gainful activity." The district court was correct in noting, however, that there is no requirement in the Plan's language that Perez be "competitively employable." Thus, that part of the letter from vocational expert O'Malley opining that Perez was not "competitively employable" without additional computer training does not bear on Perez's claim one way or the other.[13] One obvious interpretation of O'Malley's statement, taken in isolation, is that Perez may have been employable without the computer course, but that he would have had a hard time finding employment in those circumstances. At another point, however, O'Malley opined more definitively that "for the reasons described above, Mr. Perez was not yet employable." In context, O'Malley may be doing nothing more than reiterating her earlier opinion that Perez is not "competitively employable." The unqualified statement, on the other hand, may mean that O'Malley thinks that "competitively employable" was just another way of saying "employable." Indeed, Perez makes an argument that the two terms are identical. We are forced to conclude that O'Malley's intended meaning is ambiguous.

Aetna places heavy reliance on various medical opinions that basically conclude Perez is capable of performing some kinds of sedentary work. The Plan, however, requires that Perez be able to engage in gainful activity to which he is suited by means of his education, training, or experience. These are matters not within the province of the medical experts Aetna relies upon. Perez requests that we hold that the language of the Plan requires Aetna to solicit vocational expert testimony determining which "reasonable occupations" are actually available to a claimant before denying benefits. There may be other ways to meet the "reasonable occupation" test set up by the Plan[14], however, so we do need not go as far as Perez requests. Nevertheless, we conclude, after applying a *de novo* standard of review to the meaning of the language of this Plan, that when a claimant produces evidence from a vocational expert that may support the conclusion that the claimant was not employable and such evidence is unrefuted by any contrary vocational evidence, the claimant has shown enough to resist a grant of summary judgment to the plan administrator, under § 1132(a)(1)(B).[15]

---

**13.** Aetna is arguing that the O'Malley letter must be ignored because it was unsigned. Of course, Perez is clearly representing that the letter is genuine. Any conflict over the authenticity of the letter, to the extent it is material to the resolution of this appeal, is inappropriate for resolution on summary judgment. Therefore, according to the standard of review we are applying to the district court's decision, we must presume that the letter is authentic for the purposes of this appeal. Aetna also argues that the letter was a draft and that a very different final letter was sent. Again, we must, at the summary judgment stage of this litigation, take the letter at face value because there is a dispute about its significance. Therefore, we ignore the possibility that the draft letter may not truly express O'Malley's opinion of the vocational options open to Perez.

**14.** For instance, if Perez had worked at the Laboratory of Clinical Medicine of Michigan State University as a lab technician before Aetna made the determination to discontinue his benefits, and Aetna had been aware of this fact, Aetna may have been on much stronger ground. However, Perez did not obtain this job until after Aetna discontinued his benefits, and so obviously Aetna could not have known he would find this job. *See McMahan v. New England Mut. Life Ins. Co.*, 888 F.2d 426, 431 n. 1 (6th Cir.1989) (noting

that " '[a] federal court is to focus on the evidence before the trustees at the time of their final decision and is not to hold a *de novo* factual hearing,' " although suggesting that this rule should be reconsidered now that *Bruch* has been decided) (quoting *Crews v. Central States*, 788 F.2d 332, 336 (6th Cir.1986), quoting *Wardle v. Central States*, 627 F.2d 820, 824 (7th Cir.1980), *cert. denied*, 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981)); *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir.1990) (taking up *McMahan*'s invitation to test the validity of *Crews* in light of *Bruch*, and holding that for various policy reasons *Crews* is sound even after *Bruch*). Moreover, the evidence relating to Perez's employment by Michigan State University, which is the basis for the worker's compensation magistrate judge's opinion, is not in the record, since Aetna presented the district court only with a copy of this opinion.

**15.** Our resolution of this issue allows us to avoid taking a position with regard to another split among the circuits in relation to the question of whether plan administrators must consult with vocational experts when making determinations about a claimant's employability. *Compare Gunderson v. W.R. Grace & Co. Long Term Disability Income Plan*, 874 F.2d 496, 499 (8th Cir.1989) (before terminating disability income benefits,

Aetna argues that it does have the opinion of a vocational expert, in the form of the letter from Perez's vocational expert, noting that "[f]ollowing the completion of this program [for an associate's degree], job placement assistance will be provided until Mr. Perez has obtained employment." Aetna consistently characterizes this as a representation that Perez was "ready" for "job placement." First, this is not what the letter says. Second, even if it did, being ready for attempted "job placement" and being "employable" are arguably two different matters, particularly if the vocational counselor who wrote this letter did not realize at the time that Perez lacked necessary computing skills.

The district court seems to have recognized many of the problems with granting summary judgment to Aetna in this case in its opinion addressing Perez's Rule 59(e) motion:

> [T]he amount of evidence provided to support defendant's position was surprisingly little. As noted by plaintiff, there was no specific showing of another person with plaintiff's limitations and skills actually performing a reasonable occupation. Also, there was no actual statement by a vocational expert that there were reasonable jobs being performed by similarly situated individuals with similar disabilities. Therefore, the relative merits of the case were not overwhelmingly in favor of defendant.

As noted above, there was no need for Aetna to show that someone with Perez's disabilities was actually employed in a job that Perez was fitted to by means of his education, training, or experience. (Although, if a person with Perez's disabilities would not be able to perform a particular job, then Perez would be physically unable to perform such a "reasonable occupation," and therefore be "disabled" under the Plan.) However, Aetna did need to show under the language of the Plan that someone with Perez's "skills" (training and experience), or "education" was actually performing a "reasonable occupation."

The definition of "reasonable occupation" in this Plan imposes three conditions that must be met before a claimant under the Plan who is otherwise disabled ceases being disabled: (1) the claimant must be fitted by education, training, or experience to perform a particular job; (2) someone of similar education, training, or experience must actually be performing such a job; (3) those people performing that job must be using it as their principal means of support.[16] Here, the only evidence Aetna presented and the district court relied on to satisfy the first requirement is really an argument—someone with an associate's degree from a community college must be able to work at some job. As a general matter, this is probably not an unreasonable assumption, but it is possible that some educational institutions, even community colleges, which generally focus more than liberal arts colleges on equipping their students with marketable skills, may produce some graduates who simply are simply not employable. Furthermore, even if other graduates of the same program Perez went through at Lansing Community college have managed to find employment, the computer

---

plan administrator should have obtained vocational expert's opinion to determine if employee was presently capable, in light of his physical impairment, to perform "any occupation") *with McKenzie v. General Tel. Co. of Cal.,* 41 F.3d 1310, 1317 (9th Cir.1994) ("we hold that consideration of vocational evidence is unnecessary where the evidence in the administrative record supports the conclusion that the claimant does not have an impairment which would prevent him from performing *some identifiable job*"), *cert. denied,* — U.S. ——, 115 S.Ct. 1697, 131 L.Ed.2d 560 (1995); *Duhon v. Texaco, Inc.,* 15 F.3d 1302, 1309 (5th Cir.1994) (not an abuse of discretion for plan administrator to fail to consider vocational evidence in connection with plan having language similar to Aetna's Plan in this case); and *Block,* 952 F.2d at 1455 (no need

for plan administrator to provide vocational evidence of jobs where plan used phrase "reasonably fitted by education, experience, capability or training").

**16.** Because Perez prevails on a plain meaning construction of the Plan's terms, there is no need to address his argument that the court should apply the canon of *contra proferentem* to its interpretation of the Plan. *See Edwards v. State Farm Mut. Auto. Ins. Co.,* 851 F.2d 134, 136 (6th Cir. 1988) (statements in plan summary are binding even if they conflict with language of plan itself); *Sprague v. General Motors Corp.,* 843 F.Supp. 266, 307 (E.D.Mich.1994) ("benefit plan ambiguities must be construed in the employees' favor," citing *Edwards* ).

skills that O'Malley asserts that Perez needs to obtain employment may have been obtained by those other Lansing graduates outside of their formal instruction at Lansing. Many younger students acquire in high school or computing at home as a hobby the basic computer skills O'Malley claims Perez needs.

To protect its grant of summary judgment when the *de novo* standard of review applies, Aetna has to do more than simply invite this court to make a plausible assumption. There is no evidence in the record to support the conclusion that people with an associate's degree from Lansing are employable simply because they hold such a degree. Moreover, there is no evidence in the record to support the conclusion that the second and third requirements of the definition of a "reasonable occupation" in the Plan are met. Aetna has no evidence from which it could conclude that there is any job being performed by someone of Perez's education, training, or experience. Indeed, Aetna cannot point to any particular job (other than the lab technician job that we must ignore, given our refusal to address Aetna's collateral estoppel argument) that Perez can perform. Aetna's argument is that it does not need to point to any specific job. This is a misinterpretation of the terms of the Plan. Finally, Aetna has not offered any evidence from which one could conclude that there is some specific job from which those with a similar background to Perez are drawing their principal means of support.

Under a *de novo* standard of review, the district court's grant of summary judgment to Aetna must be reversed. There is undisputed evidence in the record that could be read to support the conclusion that Perez is not employable. Most importantly, the Plan administrator, Aetna, has presented no evidence to support its conclusion that Perez could engage in a "reasonable occupation" simply because he obtained an associate's degree. Genuine issues of material fact preclude summary judgment in this case.

## VII

We **REVERSE** the district court's grant of summary judgment to Aetna and **RE-MAND** for the district court to conduct fur-

ther proceedings in this case in accordance with this opinion.