**John RAGSDALE, Plaintiff,**

v.

**UNUM LIFE INSURANCE COMPANY OF AMERICA, Defendant.**

No. 5:96 CV 2722.

United States District Court,
N.D. Ohio,
Eastern Division.

March 23, 1998.

J. Thomas Henretta, Blakemore, Meeker, Varian, Boler & Henretta, Akron, OH, Kirk W.B. Wagar, Coral Gables, FL, for John Ragsdale.

Brett K. Bacon, Michael J. Holleran, Thompson, Hine & Flory, Cleveland, OH, for Unum Life Insurance Company of America.

David H. Wallace, Kelley, McCann & Livingstone, Cleveland, OH, pro se.

## *ORDER*

SAM H. BELL, District Judge.

Now before the court are the parties' cross-motions for summary judgment. The underlying action was brought by Plaintiff John Ragsdale under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., seeking payment of additional disability benefits beyond what he has already been paid by Defendant Unum Life Insurance Company of America ("Unum"). Mr. Ragsdale claims that Unum's determination that he was only eligible for mental illness disability benefits, as opposed to physical disability benefits, is contrary to the evidence and in subordination of Unum's duties under the law. Unum claims that it acted within its providence in denying Mr. Ragsdale additional benefits.

The court has considered the evidence and arguments of the parties, and is now prepared to offer its decision in this matter. The court finds that Unum was in error when it denied Mr. Ragsdale's request to be reclassified as physically disabled. Mr. Ragsdale's motion for summary judgment, therefore, is granted.

### Background

Plaintiff John Ragsdale is a former executive for the advertising agency of Meldrum & Fewsmith, Inc. ("Meldrum"). As an employee of Meldrum, Mr. Ragsdale was provided disability insurance under a policy issued and maintained by Unum (the "Policy"). Section

IV of the Policy, dealing with "Benefits," states that:

> [w]hen the Company receives proof that an insured is disabled due to sickness or injury and requires the regular attendance of a physician, the Company will pay the insured a monthly benefit after the end of the elimination period. The benefit will be paid for the period of disability if the insured gives to the Company proof of continued:
>
> 1. disability; and
> 2. regular attendance of a physician. The proof must be given upon request and at the insured's expense.

(Jensen Aff. Bates No. 00029.) The Policy also contains a "Mental Illness Limitation," which states that "[b]enefits for disability due to mental illness will not exceed 24 months of monthly benefit payments...." (*Id.* at 00033.) Benefits for disabilities due to physical illness are paid under the Policy until the claimant reaches 65. (*Id.*)

Mr. Ragsdale has a history of emotional and physical problems. He was born with an eye disease called congenital nystagmus. (*Id.* at 00411.) He has some vision, but has been legally blind all of his life. (*Id.*) His father was physically and sexually abusive, and his mother was a manic depressive who was in and out of hospitals most of his young life. (*Id.*) Despite these disadvantages, Mr. Ragsdale was able to excel in school and received an athletic scholarship for swimming to attend Notre Dame University. (*Id.*) While at Notre Dame, he developed an addiction to morphine when he was given the drug as treatment for a broken wrist. (*Id.*) Over the years, Mr. Ragsdale also developed an addiction to alcohol. (*Id.*) Mr. Ragsdale's emotional and physical difficulties did not prevent him, however, from becoming an important and influential employee of Meldrum Advertising Agency. His last position with Meldrum, before he discontinued work because of disabilities, was Senior Vice President and Creative Director. His emotional condition deteriorated over the years as a result of his alcoholism, the break-up of his marriage, and the death of his father. (*Id.*) He has unsuccessfully attempted suicide a number of times. (*Id.*)

On July 14, 1994, Mr. Ragsdale submitted a claim for disability benefits to Unum. (*Id.* at 00454.) He indicated that his symptoms were "depression, exhaustion, sleeplessness, pain, headache, nausea, and anxiety." (*Id.*) Mr. Ragsdale also stated that "the condition is highly aggravated by blindness and cervical spine injury" and that he was "incapacitated and unresponsive to therapy for depression." (*Id.*) When asked to list all physicians with whom he had sought treatment for his claimed condition, Mr. Ragsdale listed five psychiatrists. (*Id.* at 00455.) His treating physician, Dr. Michael Arcuri, submitted a statement dated July 18, 1994 which indicated that Mr. Ragsdale was suffering from "severe depression" and a "recent near fatal suicide attempt." (*Id.* at 00425.)

On August 19, 1994, Unum sent a letter to Mr. Ragsdale indicating that his request for disability benefits had been approved. (*Id.* at 00380.) On the same day, Unum sent an additional letter to Mr. Ragsdale instructing him that his disability was being classified as a *mental* illness, and that the 24 month Policy limitation was therefore in effect. (*Id.* at 00378.) Mr. Ragsdale's benefits were scheduled to terminate on April 1, 1996. (*Id.* at 00379.)

On July 18, 1995, 10 months prior to the expiration of his mental disability benefits, Mr. Ragsdale sent a letter to Unum indicating that he would be sending medical files "to support change to LT physical disability coverage." (*Id.* Bates No. 00212.) The physical impairments upon which Mr. Ragsdale bases his claim are: (1) his visual impairment, and (2) lingering neck and/or back pain following one or more accidents in the early 1990s.

Mr. Ragsdale submitted additional evidence relating to his back and neck condition in connection with his original effort to be reclassified as physically disabled. A January 22, 1991 report by Dr. Jon L. Weingart states that Mr. Ragsdale "was involved in a motor vehicle accident in which the car in which he was riding was struck from behind" resulting in "musculoskeletal neck pain, posttraumatic." (*Id.* at 00098.) An April 8, 1994 report by Dr. Robert G. Slater states that

Mr. Ragsdale "reported that in 1991 he had a very bad accident on a movie set and fractured several vertebra. He had extensive back surgery and subsequently became addicted to opiate medications ... [h]e also reports back pain and right knee pain." (*Id.* at 0363.) An April 3, 1994 report by Dr. Edward Stump states that Mr. Ragsdale "had some sort of cervical fracture in an accident while filming a commercial in 1990. He states that he was on the exposed boom of a camera truck which ran into another truck and he has required two fusions in 1990. He is having no particular neck pain now and has no upper extremity problems." (*Id.* at 0372.) On July 25, 1995 the Social Security Administration notified Mr. Ragsdale that he was disabled under the terms of the Social Security Act. (*Id.* at 00209.)

On February 8, 1996, Unum sent Mr. Ragsdale a letter denying his request to be reclassified as physically disabled. The letter stated that:

> Although it is reasonable you have some restrictions and limitations relating to your cervical fusion, you continued to work for at least two years. You have demonstrated the ability to productively and gainfully work with blindness. Under the terms of your contract your blindness is not considered your disabling condition.

> The recent information you sent for consideration is quite old, therefore does not establish objective data to support a physical disability now. The supplemental form completed by Dr. Martin Loftus on January 25, 1996 indicates you could work 'if employment needs and limitations are met.' This statement indicates work capacity from a physical standpoint.

(*Id.* at 00132.) Mr. Ragsdale responded to this letter with a letter of his own, requesting a review of his file and the opportunity to submit additional evidence. (*Id.* at 00118.) Unum granted this request, and spent a period of time re-evaluating Mr. Ragsdale's claims by reviewing additional evidence and discussing the matter with Mr. Ragsdale's doctors: Dr. Loftus, Dr. Yassine, and Dr. Buzney. Unum sent a letter to Mr. Ragsdale on September 23, 1996, which again communicated Unum's refusal to re-classify Mr. Ragsdale as physically disabled. The court reproduces the bulk of the letter below to both lay out Unum's analysis in denying Mr. Ragsdale's request, and as well, the medical information available to Unum at the time of re-evaluation:

> Our review of your claim notes that you stopped working in your regular occupation as a creative director for an advertising agency as of 1/1/94 due to depression. Our review of your file documentation finds that you have been legally blind since birth. In 1991 you were involved in a motor vehicle accident which resulted in surgery involving a cervical fusion and laminectomy. You were admitted to the Silver Spring Hospital in January, 1994 for depression and substance abuse problems....

> Our 2/8/96 letter acknowledged the receipt of the additional medical information submitted to support your claim that you continue to be disabled on a physical basis beyond 4/1/96 when your eligibility for long term disability benefits for your psychiatric condition ended. This letter explained to you that although it is reasonable for you to have some restrictions and limitations due to your neck pain, you continued working in your regular occupation for approximately two years following your neck surgery until your date of disability on 1/1/94. The letter also explained that you had also demonstrated your ability to work with your visual limitations prior to your date of disability on 1/1/94.

> We received Dr. Loftus' 3/5/96 report which indicates that he has been treating you for approximately one year. Dr. Loftus indicates that due to the worsening of your multiple problems with addiction, depression and your neck, you have been unable to return to your previous occupation. Dr. Yassine's 3/15/96 report concludes that it is very difficult for you to continue carrying on your duties while working with a computer which causes discomfort in your neck. This is complicated by your blindness which make it more difficult to work with computers which is necessary to perform your job. Dr. Buzney's 4/16/96 report states his belief that

"it is a miscalculation to believe that Mr. Ragsdale's visual function is equal to that which he enjoyed prior to his accident and ensuing difficulties."

Following our initial review of your appeal, it was determined that your medical records should be reviewed by our on-site physician. Our physician's 9/6/96 report concludes that based on his review of your claim file, there is no clear objective medical evidence to show how your neck pain and visual condition has worsened to prevent work capacity in your regular occupation. Our physician notes that neither Dr. Yassine nor Dr. Buzney have submitted objective medical data to support their recent medical opinions.

Our physician's report indicates that he made telephone calls to speak with your attending physicians to obtain a clearer picture of your medical condition. The file documentation indicates that our physician spoke with Dr. Yassine over the telephone on 9/9/96. According to our physician's documentation of that conversation, Dr. Yassine explained that he thinks that your visual problems are the cause of your disability, and he does not think that your neck problem is the major issue.

On 9/10/96 our physician spoke with Dr. Loftus, who explained that his 3/5/96 opinion letter on your behalf, as well as his 1/96 functional capacity evaluation, is not based on objective medical evidence, but upon your subjective complaints to him. Dr. Loftus stated that he thinks that your visual problem is the cause of your disability, however he seemed surprised to learn from our physician that you had previously been working with your visual condition. Dr. Loftus would not release you to return to work, and he indicated that he would need to review the medical information he has, and contact us. To date, we have [sic] are not aware that Dr. Loftus has contacted us.

Our physician also spoke with Dr. Tsai on 9/10/96, and Dr. Tsai states that as he has only seen you on one occasion, he is not in a position to evaluate your visual changes over the years. Our physician attempted to speak with Dr. Buzney on 9/6/96, but Dr. Buzney preferred that our physician send him a letter. Our physician sent Dr. Buzney a 9/6/96 letter to obtain more information regarding your visual condition and changes and to ask about the ongoing treatment of your neck condition. To date, we are not aware that Dr. Buzney has responded to our request for information. . . .

[Y]ou must provide proof of continued disability and the regular attendance of a physician for the condition for which you claim disability. Although your attending physicians have provided opinion letters which support that you are disabled, our physician does not find sufficient objective medical data; i.e., ongoing treatment records and testing from 1/94 to the present; in your claim file to support the recent statements by your attending physicians.

In addition, our physician has not found sufficient evidence in your claim file that you have had the regular attendance of a physician for your neck and vision conditions for which you now claim continued disability. Moreover, our physician is not able to establish how your vision and neck conditions have worsened since 1994 to preclude work capacity in your regular occupation. You had previously been able to perform your regular occupation with your neck and vision conditions prior to 1/94 when you stopped working due to depression and substance abuse problems.

At this time, we find that there is insufficient medical evidence in your claim file to support your claim that you have been continuously disabled due to your neck and vision conditions, and that you have been under the regular attendance of a physician for these conditions for which you are claiming disability. Therefore, you do not meet the above-referenced policy requirement regarding disability and proof of your claim for disability on a physical basis, and your claim will remain closed.

However, if we receive new, objective medical evidence from Dr. Buzney or Dr. Loftus in the next 30 days from the date of this letter, the information will be reviewed by our medical department for reconsideration.

(*Id.* at 0080.) According to Unum, no additional evidence was filed within 30 days. On December 18, 1996, Mr. Ragsdale filed the complaint in the present action.

In his motion for summary judgment, Mr. Ragsdale now argues: (1) that the court should review Unum's determination of his disability status *de novo* to determine whether Mr. Ragsdale is *actually* disabled under the terms of the Policy; (2) that, under this *de novo* standard, Mr. Ragsdale should be allowed to present additional evidence of his physical disability for the court's consideration, even though such evidence was not available to Unum when it denied Mr. Ragsdale's request for reclassification; and (3) that Mr. Ragsdale's evidence shows that Unum cannot produce any factual dispute as to his physically disabled status. Alternatively, in Unum's motion for summary judgment, it argues: (1) that Unum's determination of Mr. Ragsdale's disability status should be reviewed under an *abuse of discretion* standard; (2) that, under this standard, Unum's determination was clearly not an abuse of discretion; (3) that, in any event, Mr. Ragsdale is precluded from introducing additional evidence at this time; and (4) that, regardless of the standard of review adopted by the court, Unum's determination that Mr. Ragsdale was not physically disabled within the terms of the Policy was a correct and irreversible determination. The court will address each of these arguments in turn.

## Summary Judgment—Standard of Review

The Court of Appeals for the Sixth Circuit recently summarized the standard of review governing motions for summary judgment under Federal Rule of Civil Procedure 56:

> Summary judgment is appropriate where 'there is no genuine issue of material fact ... and the moving party is entitled to judgment as a matter of law.' .... [The] court must view all facts and inferences drawn therefrom in the light most favorable to the non-moving party.

> The moving party has the burden of conclusively showing that no genuine issue of material fact exists. Nevertheless, in the face of a summary judgment motion, the nonmoving party cannot rest on its pleadings but must come forward with some probative evidence to support its claim.

> 'By its very terms, this standard provides that the existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.' The dispute must be genuine and the facts must be such that if they were proven at trial, a reasonable jury could return a verdict in favor of the nonmoving party. If the disputed evidence 'is merely colorable or is not significantly probative, summary judgment may be granted.'

*Leo LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir.1993) (citations omitted). With this standard in mind, the court shall analyze the parties' cross-motions for summary judgment.

## Law and Analysis

In the court's estimation, the parties raise three legal questions in the context of this litigation. First, what standard of review is the court to use in considering whether Unum's determination of Mr. Ragsdale's disability status should be upheld? Second, is Mr. Ragsdale entitled to introduce additional evidence at this time which was not available to Unum at the time that it made its determination? Third, considering all admissible evidence and the applicable standard of review, should Unum's determination be upheld by this court?

### I.

### Standard of Review

■ In *Firestone Tire & Rubber Company v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that *de novo* review is appropriate in an action challenging the denial of benefits based on plan term interpretation *unless* the plan gives the administrator discretionary authority to interpret plan terms. If the plan administrator is given discretion, then the court must apply the highly deferential *abuse of discretion* standard of review, under which the decision will be overruled only if it

was arbitrary and capricious. *Id.* 489 U.S. at 115. In the present case, the parties ask the court to determine whether the following language gave Unum the necessary discretion to trigger the *abuse of discretion* standard:

When the Company receives proof that an insured is disabled due to sickness or injury and requires the regular attendance of a physician, the Company will pay the insured a monthly benefit after the end of the elimination period. The benefit will be paid for the period of disability if the insured gives to the Company proof of continued:

1. Disability; and

2. Regular attendance of a physician.

The proof must be given upon request and at the insured's expense.

(Jensen Aff. at Bates No. 0029.)

## A.

### *Prior Case Law*

A discussion of prior case law is necessary before the court can answer the narrow question before it.

In the case of *Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979 (6th Cir.1991), the Sixth Circuit was asked whether certain language granted discretion to the plan administrator in determining eligibility for benefits. The language stated that a disability determination would be made "on the basis of medical evidence satisfactory to the Insurance Company." *Id.* at 980. The Sixth Circuit held that such language did, in fact, grant clear discretion to the plan administrator and concluded that the district court correctly applied an arbitrary and capricious standard to review the defendant's termination of benefits. *Id.*

In *Yeager v. Reliance Standard Life Insurance Company,* 88 F.3d 376 (6th Cir. 1996), the Circuit was asked to consider whether the requirement that a claimant submit "satisfactory proof of total disability to us" was a sufficient grant of discretion to warrant application of the arbitrary and capricious standard. In holding that there *was* a grant of discretion, the Circuit stated that:

[t]he critical requirement in Miller is that the evidence of disability be satisfactory.

A determination that evidence is satisfactory is a subjective judgment that requires a plan administrator to exercise his discretion. Like the Miller plan, the Plan at issue in this case requires 'satisfactory proof of total disability.' It would not be rational to think that the proof would be required to be satisfactory to anyone other than defendant Reliance. Even if the phrase 'to us' is interpreted as defining to whom the proof should be submitted, there is no reason to believe that someone other than the party that received the proof would make a determination regarding its adequacy.

*Id.* at 381. The strength of the *Yeager* decision (and all inferences which might be drawn from its reasoning) is unclear, however, based on the Sixth Circuit's decision to vacate its ruling in *Perez v. Aetna Life Insurance Company,* 96 F.3d 813 (6th Cir. 1996). In *Perez,* the plan contained the following language:

[s]ubsequent written proof of the continuance of such disability must be furnished to Aetna at such intervals as Aetna may reasonably require... Aetna shall have the right to require as part of the proof of claim satisfactory evidence ... (2) that the claimant has furnished all required proofs for such benefits.

*Id.* at 825. The court originally held that the plan language did not give the plan administrator discretion to determine eligibility for benefits:

[f]irst, simply because Aetna has the ability to require written proof before continuing disability benefits does not mean that Aetna has the discretionary authority to decide whether that proof is sufficient within the meaning of the Plan. Second, simply because Aetna may require 'satisfactory proof' does not give the insurance company discretionary authority, either. The quoted Plan provision does not specify to whom the proof should be satisfactory. Perez is probably correct in arguing that this language creates an objective standard—proof 'satisfactory' to a reasonable person. But all we need decide at this point is that the language does not clearly

give Aetna discretion, which is what the language of an ERISA plan must do under *Bruch* to trigger abuse of discretion review.

*Id.* The Sixth Circuit has decided to vacate *Perez*, and, in doing so, to rethink *Yeager*. *Perez v. Aetna Life Insurance Company*, 106 F.3d 146 (6th Cir.1997):

> A majority of the judges of this court in regular active service has voted to rehear the instant case en banc, having concluded that the following important issues, also presented and decided in *Yeager v. Reliance Standard Life Insurance Co.*, 88 F.3d 376 (6th Cir.1996) ... are at stake:...
>
> 2. Whether plain language stating that a plaintiff must 'submit satisfactory proof .... to us' gives the administrator broad discretion, just as it would if the language read 'must submit proof that is satisfactory to us,' see *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 983 (6th Cir.1991.)

*Id.* To date, the Sixth Circuit has not issued a new decision in *Perez*. Sixth Circuit Rule 14 states that, "the effect of the granting of a rehearing en banc shall be to vacate the previous opinion and judgment of this court, to stay the mandate and to restore the case on the docket as a pending appeal."

None of the decisions cited above deal with plan language which required "proof" without modifying that term with the word "satisfactory." Defendant, however, cites the case of *Bollenbacher v. Helena Chemical Co.,* 926 F.Supp. 781 (N.D.Ind.1996), in which the court stated:

> [a]s a practical matter, it is difficult to detect a qualitative difference between plan language that requires a claimant to submit 'proof and one that requires the submission of "such due proof" or even "satisfactory proof." Indeed, adjectives like "satisfactory" seem rather redundant when teamed with the concept of "proof." '
> .... In short, plan language which requires a claimant to submit 'proof' of a claim does, by its very nature, grant discretion to the plan administrator to determine eligibility for benefits.

*Id.* at 787. Recently, the district court for the Northern District of Kansas adopted the reasoning of the district court's decision in *Bollenbacher*:

> Courts also have found the words 'due proof' or simply 'proof' to convey discretionary authority. See *Patterson v. Caterpillar, Inc.*, 70 F.3d 503, 505 (7th Cir.1995) ('benefits will be payable only upon receipt by the Insurance Carrier or Company of such notice and such due proof, as shall be from time to time required, of such disability'); *Bollenbacher v. Helena Chemical Co.*, 926 F.Supp. 781, 786 (N.D.Ind.1996) ('benefits will be paid "[w]hen the Company receives proof that the individual is disabled due to sickness or injury and requires regular attendance of a physician" ').

The court finds this reasoning persuasive and will apply the arbitrary and capricious standard.

*Caldwell v. Life Insurance Company of North America*, 959 F.Supp. 1361 (N.D.Kan. 1997). Alternatively, in *Plasman v. Unum Life Insurance Company of America*, No. 90–873 (W.D.Mich. July 8, 1991) at *1, the district court, interpreting (assumedly) identical language, held that "[t]here is no dispute that Unum's decision to deny plaintiff's claim must be reviewed under a de novo standard of review."

### B.

The court finds itself in uncharted waters, or perhaps, in charted waters with an outdated map. The Circuit, in *Yeager*, clearly emphasized the importance of the word "satisfactory" in determining whether discretion was granted to a plan administrator. Reading *Yeager* alone, this court would be led to the conclusion that, in the absence of a term such as "satisfactory" or some other similar modifier, the requirement that a disability claimant provide "proof" does *not* grant discretion to the plan administrator to determine eligibility for benefits. However, the Circuit's decision to vacate *Perez*, it could be argued, dilutes this message.

The court could attempt to read into the decision to vacate *Perez*, construing it to mean that the placement, or even presence, of the word "satisfactory" is no longer important because the Circuit is likely to decide

that a requirement of "proof" is itself sufficient to establish discretion on the part of a plan administrator. A narrower reading of the decision to vacate *Perez* could be that the exact placement of the word "satisfactory" does not matter as long as the modifier (or another word or phrase communicating a similar idea) appears somewhere in the plan. This type of analysis, however, seems particularly speculative, and the court does not approve of side-show fortune-telling in the context of decisions of law.

■ In *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 1921–22, 104 L.Ed.2d 526 (1989), the Supreme Court stated: "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." The court chooses to follow this line of reasoning in deciding the matter at hand.

*Yeager* has not been overruled, and is still good law. In that decision, the Circuit makes explicit that the reason why administrative discretion was found was because a disability claimant was required to provide "satisfactory" proof to the plan administrator. In the present case, Mr. Ragsdale was not required to provide "satisfactory proof" or "due proof." He was only required to produce "proof."

It is true that there are no "magic words" required to trigger the application of the *abuse of discretion* standard of review, and that an intent to grant discretion need only appear on the face of the plan documents. *See Block v. Pitney Bowes, Inc.*, 952 F.2d 1450, 1453 (D.C.Cir.1992). The court does not believe that it is searching for magic words in this case. Instead, the court is interpreting the language of the Policy in light of controlling Sixth Circuit precedent.

In addition, the court notes that is not entirely persuaded by the reasoning of the *Bollenbacher* and *Caldwell* courts. In the court's mind, there is, at least arguably, a difference between the requirement that a claimant submit "satisfactory proof" or "due proof" and the requirement that a plaintiff

submit simply "proof." The presence of the modifier could indicate that someone will be in a position to decide whether the proof submitted is, in fact, satisfactory or due. The absence of the modifier could indicate that "proof" will be determined according to objective, reasonable standards—would a reasonable person consider that the existence of a disability had been proved? The court admits that these are only plausible readings of the phrases discussed above, but notes that "we must construe ambiguities in an ERISA plan against the drafter and in favor of the insured." *Barnes v. Independent Auto. Dealers of Cal.*, 64 F.3d 1389, 1393 (9th Cir.1995). Moreover, the Supreme Court stated in *Bruch* that the default position in these cases is *de novo* review.

This court finds, therefore, in favor of the insured, Mr. Ragsdale, on the issue of Unum's ability to use its own discretion in deciding whether he was physically disabled. The language of the Policy did not give Unum such discretion, and the court will review its rejection of his claim *de novo*.

## II.

### *Introduction of New Evidence*

■ Mr. Ragsdale may not introduce new evidence which was unavailable to Unum at the time that his eligibility for benefits was determined. In *Miller*, the Sixth Circuit held:

> when reviewing a denial of benefits under ERISA, a court may consider only the evidence available to the administrator at the time the final decision was made. This limitation applies to both an 'arbitrary and capricious' or a 'de novo' standard of review.

*Miller*, 925 F.2d at 986 (citations omitted).

## III.

### *Mr. Ragsdale's Eligibility for Benefits*

■ Finally, the court will decide, using a *de novo* standard of review, whether Unum's determination that Mr. Ragsdale was not physically disabled was correct. De novo review means a review "without deference to the decision or any presumption of correct-

ness, based on the record before the administrator." *Perry v. Simplicity Engineering,* 900 F.2d 963, 966 (6th Cir.1990.) "When a court reviews a decision de novo, it simply decides whether or not it agrees with the decision under review." *Id.*

The court must, then, determine whether Mr. Ragsdale submitted proof: (1) that he is "disabled due to sickness or injury" and that, for the period of his disability, he has (2) regularly attended a physician. (Jensen Aff. at Bates No. 00029.) Under the Policy, "disability" means that:

> because of injury or sickness the insured cannot perform each of the material duties of any gainful occupation for which he is reasonably fitted by training, education, or experience.

(*Id.* at 00027.)

The court has carefully considered the administrative record before Unum at the time that it made its determination that Mr. Ragsdale had not submitted proof that he was physically disabled and that he has regularly attended a physician during his period of disability. The court finds that the record contains the following relevant evidence: (1) a test report from Ohio Retina Associates stating that Mr. Ragsdale's eyesight was 20–400 (*Id.* at 00092); (2) the January 22, 1991 report of Dr. Weingart stating that Mr. Ragsdale experienced neck pain from a motor vehicle accident in 1990 (*Id.* at 00098); (3) the April 16, 1996 report of Dr. Sheldon M. Buzney stating that:

> Mr. Ragsdale's retinas appear stable on the basis of previous examinations with evidence for significant macular dysfunction (legal blindness) and severe peripheral retinal degeneration as lattice with holes (treated with laser photocoagulation).
>
> Mr. Ragsdale is able to maximize available macular function OU through the use of low vision aids; but these aids require strenuous effort and incredible physical adaptability. With low vision aids, objects to be viewed must be held extremely close to the eye and often objects to be scanned must be assessed monocularly. It is quite apparent to me that Mr. Ragsdale's cervical disc disease even as optimally treated as at present and other optical devices

which would allow him to recruit sufficient macular function so as to perform his profession as a creative director (advertising agency). Mr. Ragsdale should, in my opinion, definitely be considered fully disabled with regard to his previous profession as creative director what with the severe limitations placed upon use of his vision as a result of his cervical disease. I believe it is a miscalculation to believe that Mr. Ragsdale's visual function is equal to that which he enjoyed prior to his accident and the ensuing disabilities.

(*Id.* at 00109); (4) the 3/15/96 report from Dr. Zouhair C. Yassine, stating that Mr. Ragsdale is:

> a gentleman whose job is a creative director in an advertising agency. As such, he writes at a computer, edits films and video tapes in a computer situation, he also composes music in computer situations. He works with visual material. He has to interact with the employees and he spends 30% of his time traveling.
>
> This patient in the past had a serious industrial injury to his cervical spine which required a laminectomy and a fusion of the 5th and 6th cervical vertibrae. The patient developed an alcohol and drug abuse situation which required treatment in drug abuse centers. The present problem the patient is facing is that in spite of his pain that he has in the cervical spine he cannot take medication because of the genetic disorder of his blood with lack of Choline Esterase Enzyme. The drugs which would relieve his pain are habit forming and the patient does not dare take them.
>
> His problem is further complicated with his visual difficulties. He is considered legally blind. He was treated for congenital nystagmus and he has had surgery on his left eye. He is presently learning braille and is learning all the techniques blind people use to be able to survive.
>
> It is very difficulty [sic] for this patient to continue carrying on his duties working with a computer as this causes discomfort in his neck for which he cannot take any medication for relief. This is further complicated by his blindness which should

make it more difficulty [sic] to work with computers which is a necessity in his job. (*Id.* at 000115); (5) the 3/5/96 report of Dr. Martin Loftus stating that he has treated Mr. Ragsdale for over a year and chronicling Mr. Ragsdale's cervical pain, addiction to drugs, and vision problems; (*Id.* at 00125); (6) Unum report acknowledging that Mr. Ragsdale would be restricted if he returned to work: "i.e. no prolonged standing / walking, limited lifting, limited bending" but stating that no objective evidence existed to show why he *could* work prior to 1/1/94 but could not work after that date, (*Id.* at 00134) (7) Report of Dr. Loftus containing phrase that Mr. Ragsdale could return to work part time "if his employment needs and limitations are met", (*Id.* at 00140); (8) 2/6/95 report of Dr. Garry Pennington finding congenital nystagmus, cervical spine fusion with cervical spine pain and stiffness with diminished range of motion, and a limitation to sitting, standing, lifting, carrying, and seeing (*Id.* at 00149.); (9) 2/6/96 X Ray Interpretation by Dr. Szung B. finding "degenerative arthritis of the cervical spine" (*Id.* at 00150); (10) 8/14/93 report of Dr. Sanford Emery discussing Mr. Ragsdale's back and neck pain and his limitation of sitting for only 15 minutes, walking 200 yards and standing for 10–15 minutes (*Id.* at 00155); (11) the determination by the Social Security Administration that Mr. Ragsdale is disabled (*Id.* at 00209).

The court finds, based on this evidence and other evidence in the record, that Mr. Ragsdale is physically disabled within the meaning of the Policy, and that he has regularly seen a physician, Dr. Loftus, for the period of his disability (as well as numerous other physicians). The court finds that the combination of Mr. Ragsdale's vision problems, addiction to drugs, and cervical injuries, make him entirely unable to return to work as an executive for Meldrum.

It is true, as Unum noted in its original letter denying Mr. Ragsdale's reclassification, that the doctors who have opined as to Mr. Ragsdale's condition have not provided Unum with specific tests showing the degeneration of Mr. Ragsdale's physical condition since 1/1/94. Nevertheless, it does not appear to the court that Unum could contest that Mr. Ragsdale is now severely limited physically. He is unable to take certain pain medication because of his addictions, and is unable to continue using visual aids because of the pain from his cervical injuries. He suffers from degenerative arthritis in his back, and cannot walk, sit, or stand for any amount of time. While his vision may not be getting any worse, and the court is not even sure of this fact, his visual impairments are clearly more debilitating as his back pain and his addictions combine to limit him in other realms of activity. Numerous doctors have opined that Mr. Ragsdale is unable to work due to his physical disabilities. Mr. Ragsdale is entitled to a reclassification as physically disabled under the Policy.

### Conclusion

Mr. Ragsdale is to be reclassified as physically disabled, and is entitled to back benefits from April 1, 1996, the date that his mental disability benefits ended, as well as those future benefits attendant to the Policy for physically disabled persons.

IT IS SO ORDERED.