**In re Johnny Hal CAMPBELL, Debtor.**

**Henry E. Hildebrand, Trustee and Johnny Hal Campbell, Plaintiffs,**

**v.**

**Fortis Benefits Insurance Co., Defendant.**

No. 3–98–0496.

United States District Court, M.D. Tennessee, Nashville Division.

Sept. 29, 2000.

William T. Cheek, III, Lassiter, Tidwell & Hildebrand, Nashville, TN, Henry Edward Hildebrand, III, Nashville, TN, John William Beasley, Nashville, TN, for plaintiffs.

Stephen P. Hale, Hale, Headrick, Dewey & Wolf, PLLC, Memphis, TN, Stirman R. Headrick, Hale, Headrick, Dewey, Wolf, Golwen, Thornton & Chance, PLLC, Memphis, TN, for defendant.

## MEMORANDUM

ECHOLS, District Judge.

Presently pending before the Court is Plaintiffs' Motion for Partial Summary Judgment (Docket Entry No. 34), to which Defendant has responded in opposition. Also pending is Defendant's Motion to Deny Relief and to Affirm the Plan Administrator's Decision to Deny Benefits (Docket Entry No. 37), to which Plaintiffs have responded in opposition.

## I. PROCEDURAL HISTORY

Prior to the onset of his alleged disability, Plaintiff Johnny Hal Campbell worked for U.S. Air, Incorporated. On September 1, 1990, Campbell was enrolled as a participant in U.S. Air's group long term disability plan. This plan was issued by Defendant Fortis Benefits Insurance Company. In April 1995, Campbell filed for disability under the long term disability plan issued by Defendant. On June 20, 1997, Campbell filed a Chapter 13 bankruptcy petition in the Middle District of Tennessee. Campbell was informed of Defendant's decision to deny his disability claim by letter dated November 7, 1997. Campbell then filed an administrative appeal of the denial of benefits, which was denied on August 2, 1999.

On May 1, 1998, Campbell and the Bankruptcy Trustee (collectively "Plaintiffs") instituted an adversary proceeding against Defendant seeking recovery of disability benefits allegedly owed to Campbell. On March 24, 1999, pursuant to Defendant's petition, the district court withdrew its reference of the adversary proceeding bankruptcy court. Campbell then sought to amend his Complaint in order to file a claim under the Employment Retirement Income Security Act ("ERISA") and a claim for malicious harassment under Tennessee Code Annotated section 4–21–701. The parties entered into a consent order on September 20, 1999, allowing Campbell to amend his Complaint to allege an ERISA claim for benefits under 29 U.S.C. § 1132, and agreed to hold Campbell's motion to amend to allege a malicious harassment claim in abeyance pending further order of the Court. Concurrent with the consent order, Campbell filed an amended complaint alleging a claim under 29 U.S.C. § 1132.

Plaintiffs now seek partial summary judgment as to their claim under 29 U.S.C. § 1132 to recover long term disability benefits. In response, Defendant asserts that summary judgment is not the appropriate procedure for disposition of this case and asks the Court to affirm the Plan Administrator's decision to deny benefits.

## II. SUMMARY JUDGMENT STANDARD INAPPROPRIATE IN ERISA ACTIONS

At the outset, the Court notes that the United States Court of Appeals for the Sixth Circuit in *Wilkins v. Baptist Healthcare System, Incorporated,* 150 F.3d 609 (6th Cir.1998), has held that summary judgment procedures are "inapposite to the adjudication of ERISA actions" to recover benefits. *Id.* at 619. The court explained, "[b]ecause this court's precedents preclude an ERISA action from being heard by the district court as a regular bench trial, it makes little sense to deal with such an action by engaging in a procedure designed solely to determine 'whether there is a genuine issue for trial.'" *Id.* at 619. The court continued: "Rule 56 is designed to screen out cases not needing a full factual hearing. To apply Rule 56 *after* a full factual hearing has already occurred before an ERISA administrator is therefore pointless." *Id.* (emphasis in original). In adjudicating ERISA proceedings brought under 29 U.S.C. § 1132(a)(1)(B), the *Wilkins* court instructed district courts to consider only the evidence contained in the administrative record[1] and to render findings of fact and conclusions of law accordingly. *Id.*

In keeping with the *Wilkins* opinion, this Court will evaluate Plaintiffs' instant motion not as a motion for partial summary judgment but rather as a motion

---

1. The district court may consider evidence outside of the administrative record only if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part. *See Wilkins,* 150 F.3d at 619. As no such procedural challenge has been made in the instant case, the Court will consider only the evidence contained in the administrative record.

for entry of judgment reversing the plan administrator's decision to deny long-term disability benefits. In addition, the Court will consider Defendant's properly styled Motion to Deny Relief and to Affirm the Plan Administrator's Decision to Deny Benefits.

## III. FINDINGS OF FACT

The Administrative Record[2] reveals the following facts: Johnny Hal Campbell was employed by U.S. Air, Incorporated as a reservations sales agent.[3] On or about September 1, 1990, by virtue of his employment with U.S. Air, Campbell became insured under the company's group long-term disability plan. US Air is the policy holder of Group Policy Number 51500 issued by Defendant Fortis Benefits Insurance Company. Under the policy, Fortis will pay long term disability insurance benefits if an insured person satisfies the qualifying period and other provisions of the policy. More specifically, the policy provides:

[W]e will pay benefits at the end of each month (or shorter period) for which we are liable after we receive the required proof. If any amount is unpaid when disability ends, we will pay it when we receive the required proof.

[Y]ou must furnish items we decide are necessary as proof of loss or to decide our liability.

The policy contains a provision limiting benefit coverage for "periods of disability for special conditions." The maximum benefit period for all such periods of disability is twelve months unless the disabled person is confined to a hospital at the end of the twelve month period and remains disabled. The policy defines "special conditions" as: "mental illness except schizophrenia, dementia, organic brain

syndromes, delirium, amnesia syndromes, or organic delusional or hallucinogenic syndromes." The policy defines "mental illness" as: "neurosis, psychoneurosis, psychopathy, psychosis, depression, eating and sleeping disorders, or mental or emotional diseases or disorders of any kind including those caused by chemical imbalance." (U.S. Air Long Term Disability Plan, Ex. 1 to Docket Entry No. 1).

On April 25, 1995, Campbell filed a Long Term Disability Claim Statement, claiming a disability onset date of February 13, 1995. (AR 0315). Campbell claimed he was disabled due to "chronic and major depression due to chemical imbalance." (*Id.*) In her Attending Physician's Initial Statement of Disability, Psychiatrist Dr. Judith Akin, M.D. diagnosed Campbell's condition as "Organic Mood Disorder—Depression (296.83) (secondary) to hypothyroidism." (AR 0250). Thereafter, Campbell began receiving monthly disability benefits from Defendant in the amount of $1860.00. Defendant determined that Campbell had suffered from a "period of disability for special conditions" and limited his benefits to twelve months. The "special condition" was depression, a "mental illness" as defined in the policy.

On November 12, 1996, Campbell filed a Supplementary Report for Benefits claiming that he was indefinitely disabled. Thereafter, Fortis reevaluated Campbell's claim for benefits while continuing to pay monthly benefits. Fortis denied Campbell continued disability benefits by letter dated November 7, 1997. Campbell filed an administrative appeal, and by letter dated August 2, 1999, Fortis reaffirmed its previous decision to deny benefits to Campbell. The plan administrator found that "there is a lack of medical evidence to support the

---

**2.** The Administrative Record ("AR") in the present case consists of three volumes which include all documents received or compiled by Fortis relative to Campbell's claim. (Attachs. to Docket Entry No. 27).

**3.** Job duties of a U.S. Air reservations sales agent include: using a headset to answer res-

ervations telephone lines from the general public and travel agents, figuring airfares and routing, providing airport and flight information, and constructing records of reservations by entering information into a computer. (AR 0311).

position that [Campbell] may suffer from organic brain syndrome or organic mood disorder. Instead, the medical information submitted in support of Mr. Campbell's appeal, including a long standing history of depression, tends to show that he suffered from a mental illness as that term is defined in the policy." (Attachs. to Docket Entry No. 28). Following Defendant's repeated denials of coverage, Plaintiffs commenced this action.

Throughout the claims and appeals process, Fortis considered medical records from the following health care professionals: Judith Akin, M.D.; Psychiatrist; Phillip Chanin, Ed.D.; Mark Houston, M.D.; Terri Jenkins, M.D.; Ira Stein, M.D.; and James Jones, M.D. Additionally, Fortis reviewed reports from Independent Medical Examiners Williams Beret, M.D., Psychiatrist, and Joseph La Barbera, Ph.D., Clinical Psychologist, as well as from Peer Reviewers Jay Sher, M.D., Endocrinologist; Mark Moyer, M.D.; and Reginald Givens, M.D., Psychiatrist.

Dr. Judith Akin, Campbell's treating physician since February 23, 1995, diagnosed Campbell with Organic Mood Disorder Secondary to the General Medical Condition of hypothyroidism.[4] Dr. Akin believes that it is "rather straight forward" that Campbell's mental illness initially resulted from a hormone imbalance occurring in his body. (AR 0646). According to Dr. Akin, Campbell's "disability may be thought of as either mental or physical; but the underlying basis of his mental disability is his physical disability or physical condition." (AR 0645–46). She explained that after hormone therapy balances Campbell's hormones, the proper term for his condition is "Major Depression"; thus, at all times Campbell is suffering either from depression secondary to hypothyroidism (when his hormones are imbalanced) or major depression (when his hormones are balanced). (*Id.*) Dr. Akin also believes that the terms "organic brain syndrome," "mental illness," and "chemical imbalance" are "medically imprecise and rather meaningless diagnoses" because they do not appear in the most recent edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th Ed.1994) ("DSM–IV"). (AR 0646)

Dr. Mark Houston began treating Campbell in February 1994 and continued treatment through January 1996. His initial diagnosis after a comprehensive history and physical was that Campbell was suffering from depression which was well controlled on medication. (AR 0179). At that time Dr. Houston also noted that Campbell should be submitted to a thyroid function test. (AR 0181). Dr. Houston saw Campbell approximately once a month until January 1996. Under Dr. Houston's care, Campbell was diagnosed with several medical conditions, including hypertension, hypothyroidism, hyperlipidemia, chest pain, bi-fascicular heart block, malaise, fatigue, depression, and major depressive

---

**4.** As set forth in the DSM–IV, the essential feature of Mood Disorder Due to a General Medical Condition is "a prominent and persistent disturbance in mood that is judged to be due to the direct physiological effects of a general medical condition." The mood disturbance may involve a depressed mood; markedly diminished interest or pleasure; or elevated, expansive, or irritable mood. The DSM–IV further instructs:

In determining whether the mood disturbance is due to a general medical condition, the clinician must first establish the presence of a general medical condition. Further, the clinician must establish that the mood disorder is etiologically related to the general medical condition through a physiological mechanism. A careful and comprehensive assessment of multiple factors is necessary to make this judgment. Although there is no infallible guidelines for determining whether the relationship between the mood disturbance and the general medical condition is etiological, several considerations provide some guidance in this area. One consideration is the presence of a temporal association between the onset, exacerbation, or remission of the general medical condition and that of the mood disorder. A second consideration is the presence of features that are atypical of primary Mood Disorders.

DSM–IV 293.83.

disorder. (AR 0101–0110; 0193–0209). During this time, Campbell was taking Synthroid for his hypothyroidism and Wellbutrin for his depression. On April 21, 1995, Dr. Houston referred Campbell to his psychiatrist, Dr. Akin, for immediate evaluation due to major depressive disorder and suicidal thoughts. (AR 0203). At that time Campbell was on the following medications: Wellbutrin, Norvasc, Synthroid, and Ritalin. (AR 0203). On Campbell's July 11, 1995 visit, Dr. Houston noted that Campbell's hypothyroidism was under control but he was still depressed. (AR 0208).

Dr. Phillip Chanin, Campbell's treating psychologist, saw Campbell from February 1995 to April 18, 1995. In his clinical summary of outpatient psychotherapy with Campbell, Dr. Chanin stated that Campbell "was struggling with an agitated depression." (AR 0129). Dr. Chanin administered the Inventory to Diagnose Depression and concluded that Campbell's score of forty-seven (47) was in the moderately to severely depressed range; Campbell thus "met DSM–IV diagnostic criteria for Major Depression."[5] (AR 0130).

Dr. Akin referred Campbell to Dr. Terry Jenkins, who specializes in Endocrinology and Internal Medicine, to evaluate Campbell for a possible pituitary disorder. (AR 0405). After noting Campbell's symptoms of fatigue, decreased muscle strength, and voice change, Dr. Jenkins tested and treated Campbell for hypothyroidism and hypogonadism. (*Id.*) He also noted in his Summary Report that Campbell "has a long history of refractory depression." (*Id.*). In a letter dated September 12, 1996 to Fortis regarding Campbell's disability benefits coverage, Dr. Jenkins wrote: "I have just seen him in consult and he does definitely [sic] have an abnormal thyroid. This could account for the many problems that he is having. Due to these findings, he does need to be covered by disability long term." (AR 0168).

Dr. Jenkins referred Campbell to Dr. Ira Stein, a gastroenterologist, who treated Campbell for esophagitis. (AR 0052). Dr. Stein noted that Campbell's "medical history is significant for alcoholism, hypothyroidism, hypertension and depression." (*Id.*).

In a letter dated August 30, 1996 to Fortis regarding Campbell's condition, another of Campbell's treating physicians, Dr. James Jones, wrote that Campbell "has a quite complex history with a recently diagnosed problem with severe hypothyroidism" and asked that Fortis take this information into consideration when evaluating Campbell's eligibility for disability benefits. (AR 0097). During the appeal of Campbell's claim, Fortis retained the services of two physicians for independent medical examinations. Dr. William Bernet conducted a psychiatric disability evaluation of Campbell on March 26, 1999. (AR 0669). After examining Campbell for 2.6 hours and reviewing his medical and prescription records, psychological test results, and Fortis' definition of disability, Dr. Bernet rendered the following diagnoses: major depressive disorder, recurrent, moderate severity; alcohol dependence in sustained full remission; dependent personality traits; and hypo-

---

**5.** As set forth in the DSM–IV, the essential feature of Major Depressive Disorder is "a clinical course that is characterized by one or more Major Depressive Episodes without a history of Manic, Mixed, or Hypomanic Episodes." The DSM–IV instructs:

> Major Depressive Episodes in Major Depressive Disorder must be distinguished from a Mood Disorder Due to a General Medical Condition. The diagnosis is Mood Disorder Due to a General Medical Condition if the mood disturbance is judged to be the direct physiological consequence of a specific general medical condition (e.g., multiple sclerosis, stroke, hypothyroidism). This determination is based on the history, laboratory findings, or physical examination. If it is judged that the depressive symptoms are not the direct physiological consequence of the general medical condition, then the general medical condition is recorded on Axis III.

DSM–IV 296.2, 296.3.

thyroidism.[6] Campbell told Dr. Bernet that he had a long history of cyclic mood changes dating back to 1983 or 1984 when the bones in his feet were changing and forming large calluses on the soles of his feet. (AR 0670). He has continued to have periods of depression since then and has required impatient treatment on three occasions (1989, 1995, and 1997). (AR 0673). Over the years Campbell has been treated with several different psychiatric medications including Wellbutrin for depression, Zyprexa for anxiety, Klonopin for insomnia, and Neurotin and Elavil for neuropathy. (*Id.*). Campbell related a family history of alcoholism and serious depression; he thought that his father had been admitted to state hospitals on at least two occasions for the treatment of depression, and said that his maternal grandmother had received electroconvulsive therapy for depression. (AR 0674).

Dr. Bernet explained the origin of Campbell's depression as follows:

There has apparently been considerable discussion already as so [sic] whether or not Mr. Campbell has a primary psychiatric disorder (such as major depressive disorder) or psychiatric symptoms as a result of his hypothyroidism. I think the most accurate way to think about Mr. Campbell's condition is that he has a severe psychiatric condition, major depressive disorder. I think that his depressive disorder was aggravated by his thyroid condition, but I doubt that his mood problems were totally caused by endocrinological imbalances. There are several reasons to think that Mr. Campbell's depression problem and his thyroid problem are two independent illnesses. There happens to be a strong history for both of these conditions, but they seem to occur in different relatives of Mr. Campbell. Mr. Campbell described a cyclic pattern to his episodes of depression, which are typical of recurrent episodes of depressive disorder. Furthermore, significant episodes of de-

pression were occurring at least ten years prior to the time the hypothyroidism was diagnosed. It seems unlikely to me that his thyroid function was so impaired for such a long time that it caused depression, but not any other physical symptoms. Furthermore, Mr. Campbell's thyroid condition has been in fairly good control for several years, but he still has periods of depression and mood lability. Overall, Mr. Campbell has a number of serious physical and psychiatric conditions, which undoubtedly impact each other to some extent. However, I think that there are enough indications to say that he has a primary psychiatric disorder, which he would have had even if he had not become hyperthyroid.

(AR 0676). Though he concedes that he is unaware of any way to prove definitively which came first, the depression or the hypothyroidism, Dr. Bernet concludes that "it makes sense medically to conceptualize them as two separate conditions, with the hypothyroidism at times aggravating the depression." (*Id.*).

Dr. Joseph LaBarbera, Ph.D. and clinical psychologist, conducted a psychological evaluation of Campbell on March 16, 1999. (AR 0679–82). This evaluation included several psychological tests, the results of which indicated that Campbell was suffering from clinically meaningful sadness and dissatisfaction, emotional discomfort, and considerable anxious worry. (AR 0681).

Dr. Mark Moyer conducted a peer review of Campbell's claim on April 29, 1998. (AR 0367–75). Dr. Moyer reviewed Campbell's medical records from his treating physicians along with various laboratory tests and opined that Campbell has "essentially three disorders—endocrine, emotional, and laryngeal, and that at this point they are no longer related." (AR 0374). Dr. Moyer stated that Campbell's severe hypothyroidism without a doubt exacerbat-

---

**6.** Dr. Bernet also diagnosed Campbell with hypogonadism, hypertension, cardiac conduction problem, gastrointestinal problems, voice problem, neuropathy, degenerative arthritis, and recurrent plantar calluses. (AR 0675).

ed his mood disorder and depression. (AR 0371). However, he noted that because the hypothyroidism had been treated for several years, and Campbell's emotional problems should have resolved themselves during that time, "it is extremely unlikely that continued signs of depression and mood disorder or associated coping disorder can be attributed to an endocrinologic abnormality." (*Id.*) He concluded that Campbell "has both endocrine dysfunction presently stable and an emotional disorder apparently presently not well-controlled." (*Id.*)

On July 23, 1998, three doctors conducted a second peer review considering Campbell's treating physicians' notes as well as lab and other test results. (AR 0349–59). Dr. Reginald Givens, a psychiatrist, opined that "[r]ecords support a relationship between [Campbell's] hypothyroidism and depressive symptoms; however, depression may have pre-existed his hypothyroidism." (AR 0351). Dr. Givens explained this is true because "despite his thyroid levels being fairly normal, he continues to exhibit depressive symptomatology." (AR 0352) Dr. Moyers, reviewing Campbell's records for a second time, concluded that "it is possible, but very unlikely, that any of his present complaints are caused by hypothyroidism or hypogonadism, no matter what the etiology." (AR 0354). Dr. Moyers pointed out: "If all of Mr. Campbell's evident mood disorder and psychiatric conditions were due to hormone deficiencies, then it would seem likely his medication could be withdrawn rather than being additional prescribed." (*Id.*) Thus, he concludes, "it simply can not be stated that all of Mr. Campbell's emotional disorder is due to his endocrine problems." (AR 0355). Finally, Dr. Jay Sher, an endocrinologist, opined that "it is very possible when Mr. Campbell's thyroid functions were unoptimal, that this may have had some effect on his moods; however, when Mr. Campbell's endocrine testing was completely normal, he stated and it is documented that his emotional lability was extremely high." (AR 0357)

Therefore, Dr. Sher concluded "it is highly unlikely that the endocrine dysfunction which Mr. Campbell has, has chronically played into his ability to maintain normal mentality," (*id.*), "his mood disturbance cannot be blamed totally on his endocrine problems as they have been normalized many times with the exacerbation of his symptoms," (AR 0358), and "there is no causal relationship between the two that is enough to support that when normalization of the functions occurred, he should still have mental problems," (*id.*).

## IV. CONCLUSIONS OF LAW

### A. *Standard of Review*

■■■ Although the parties apparently agree that the standard of review to be applied in this case is whether Plan Administrator's determination was arbitrary and capricious, a review of the controlling case law and the language of the insurance policy indicates that such a view is incorrect. The language of the policy determines whether the Court must apply the arbitrary and capricious standard of review or whether the Court must review the determination de novo. If the language of the policy gives the plan administrator discretionary authority to determine eligibility for benefits or to construe plan terms, the highly deferential arbitrary and capricious standard applies. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). This deference is appropriate only when the plan's grant of discretionary authority is express. *See Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 380 (6th Cir. 1996).

Defendant contends that the following language in the policy grants it discretion to interpret the terms of the policy and decide whether a participant is entitled to benefits:

[W]e will pay benefits at the end of each month (or shorter period) for which we are liable after we receive the required proof.

If any amount is unpaid when disability ends, we will pay it when we receive the required proof.

[Y]ou must furnish items we decide are necessary as proof of loss or to decide our liability.

(U.S. Air Long Term Disability Plan, Ex. 1 to Docket Entry No. 1). In support of its contention, Defendant relies on the Sixth Circuit's holding in *Perez v. Aetna Life Insurance Co.*, 150 F.3d 550, 555 (6th Cir. 1998). In *Perez*, the court held that the following language granted the plan administrator discretion to request evidence supporting the claim, review it, and either grant or deny benefits: "[Aetna] shall have the right to require as part of the proof of claim satisfactory evidence ... that [the claimant] has furnished all required proofs for such benefits...." 150 F.3d at 555. The court reasoned that the right to require satisfactory evidence as part of the proof of claim meant that the evidence had to be satisfactory to Aetna and concluded that "[i]t naturally follows that Aetna, the receiver of the evidence, would review that evidence to determine if it constitutes satisfactory proof of total disability." *Id.* at 556–57.

In *Hensley v. Fortis Benefits Insurance Co.*, No. 1:99–CV–238, 1999 WL 1005651 (W.D.Mich. Aug. 24, 1999), the district court examined the precise language at issue in the instant case and found that the language did not grant Fortis discretionary authority to determine whether a beneficiary is disabled. *See id.* at *4–5. In distinguishing the Fortis language from the language in *Perez*, the Court explained:

Unlike the language in Perez, the language in this case does not use the word "satisfactory" or a similar word that confers upon the plan administrator the authority to examine the quality of or weight the evidence presented by the claimant. Instead, the language in the Policy speaks in terms of the claimant's duty to furnish evidence to substantiate his or her claim. Interpreted in light of its plain and ordinary meaning, the language is limited to specify what a claim-

ant must do to present his claim for benefits. Because the Policy does not grant Fortis discretion to determine liability, the Court concludes that the de novo standard should be applied in this case.

*Id.* at *5. The *Hensley* court cited the decision of another district court which also had considered the same Fortis language and held that the phrase "to decide our liability" was insufficient to grant discretion to the plan administrator to decide the claim. *Barnable v. First Fortis Life Ins. Co.*, 44 F.Supp.2d 196, 203 (E.D.N.Y. 1999). The *Barnable* court reasoned that the phrase "does not confer discretionary authority on the administrator in connection with the determination of disability"; rather, such language "merely speaks to the claimant's obligation to support the claim by providing all itemized bills and medical data." *Id.* at 203.

■ The Court agrees with the well-reasoned opinions of *Hensley* and *Barnable* in determining that the de novo standard should be applied in the present case. Unless a plan requires a showing of " 'satisfactory proof,' or some other qualitative threshold of proof," Sixth Circuit precedent instructs that the plan does not provide the administrator with discretion. *Sparks v. Unum Life Ins. Co.*, Nos. 99–3279, 99–3280, 2000 WL 1033003, at *3 (6th Cir. July 21, 2000) (citations omitted); *see also Ragsdale v. Unum Life Ins. Co.*, 999 F.Supp. 1016, 1023 (N.D.Ohio 1998). As the *Ragsdale* court explained:

[T]here is, at least arguably, a difference between the requirement that a claimant submit "satisfactory proof" or "due proof" and the requirement that a plaintiff simply submit "proof." The presence of the modifier could indicate that someone will be in a position to decide whether the proof submitted is, in fact, satisfactory or due. The absence of the modifier could indicate that "proof" will be determined according to objective, reasonable standards—would a reason-

able person consider that the existence of a disability had been proved?

*Id.* Accordingly, this Court will review the decision of the Plan Administrator de novo.

## B. *De Novo Review*

### 1.

▇ "When conducting a *de novo* review, the district court must take a 'fresh look' at the administrative record but may not consider new evidence or look beyond the record that was before the plan administrator." *Wilkins,* 150 F.3d at 616 (citations omitted) (emphasis in original). The de novo standard of review applies both to factual determinations and legal conclusions of the plan administrator. *See Hensley,* 1999 WL 1005651 at *3 (citing *Wilkins,* 150 F.3d at 613).

▇ While the straight-forward language in an ERISA-regulated insurance policy should be given its natural meaning, *see Turner v. Safeco Life Ins. Co.,* 17 F.3d 141, 145 (6th Cir.1994), it is well settled that ambiguous terms should be strictly construed against the insurer, *see Lee v. Blue Cross/Blue Shield,* 10 F.3d 1547, 1551 (11th Cir.1994) (collecting cases to demonstrate that the contra proferentem rule "has been widely adopted" among circuit courts for resolution of ambiguities in ERISA-regulated insurance contracts); *Rakoczy v. Traveler's Ins. Co.,* 959 F.Supp. 777, 783 (E.D.Mich.1997) (stating that if there are two reasonable meanings of policy language, the language is "ambiguous" and "must be construed against the insurer"). "When construing the terms of an ERISA policy, ambiguity exists if the policy is susceptible to two or more reasonable interpretations that can fairly be made, and one of these interpretations results in coverage while the other results in exclusion." *Luton v. Prudential Ins. Co. of America,* 88 F.Supp.2d 1364, 1370 (S.D.Fla.2000) (citations omitted). Nevertheless, "courts have no right to torture language in an attempt to force particular results or to convey delitescent nuances the contracting parties neither intended nor imagined." *Burnham v. Guardian*

*Life Ins. Co.,* 873 F.2d 486, 489 (1st Cir. 1989).

In the present case, Plaintiffs contend that certain terminology contained in the policy is not defined in the DSM–IV and is intentionally ambiguous; therefore, the Court should construe the language against the drafter, Fortis. Specifically, Plaintiffs point to the terms "mental illness," "mental or emotional disorders," and "organic brain syndromes." In response, Defendant submits that the policy language clearly communicates that disability benefits are limited for special conditions such as mental illnesses, unless the disability falls within one of the exceptions outlined in the policy.

Several courts have considered terms such as "mental illness" or "mental disorder" in the context of ERISA benefit plans. The Fifth and Eighth Circuits have found the terms to be unambiguous. *See Tolson v. Avondale Indus., Inc.,* 141 F.3d 604, 609–10 (5th Cir.1998); *Stauch v. Unisys Corp.,* 24 F.3d 1054, 1055–56 (8th Cir. 1994). These courts have held that undefined terms in a policy "should be accorded their ordinary, and not specialized, meanings," *Brewer v. Lincoln Nat'l Life Ins. Co.,* 921 F.2d 150, 154 (8th Cir.1990), and, because laypersons are inclined to focus on illness symptoms, found that illness symptoms and not etiology should be the focus of the court's inquiry, *see id.; Lynd v. Reliance Standard Life Ins. Co.,* 94 F.3d 979, 983 (5th Cir.1996) (holding that this approach comports with the definitions of "mental disorder" in the DSM–IV). As the Fifth Circuit stated in *Tolson,* "depression is a 'mental disorder,' irrespective of its physical causes or symptoms." 141 F.3d at 609.

On the other hand, the Seventh and Ninth Circuits have found the same terms to be ambiguous. *See Phillips v. Lincoln Nat'l Life Ins. Co.,* 978 F.2d 302, 310–11 (7th Cir.1992) (where the plan provided no definition of the term "mental illness," the court had "no trouble" finding the term to be ambiguous when applied to individuals

who have mental disorders caused by organic illnesses); *Lang v. Long–Term Disability Plan of Sponsor Applied Remote Tech., Inc.,* 125 F.3d 794, 799 (9th Cir. 1997) (because the plan did not specify whether a "mental disorder" should be determined by looking to a cause or symptoms of the disability or a combination of the two, the term is ambiguous).

The Sixth Circuit has addressed this issue to some extent in *Parker v. Metropolitan Life Insurance Co.,* 99 F.3d 181 (6th Cir.1996) (three judge panel).[7] The *Parker* court upheld the plan administrator's termination of disability benefits to the plaintiff, who suffered from "chronic severe major depression of a physical origin," *id.* at 184, and contended that her disability could not be considered completely mental and nervous.[8] The plan administrator determined that "[i]rrespective of any chemical factors in its etiology, major depression is a DSM III R diagnosis; Ms. Parker is being treated by a psychiatrist with psychoactive medication. In my opinion, her major depression should be reimbursed under the nervous/mental illness clause of her contract." *Id.* In applying the highly deferential arbitrary and capricious standard of review, the Sixth Circuit affirmed the district court's finding that the plan administrator's decision was rational. *See id.* at 185. Importantly, the court noted: "If the standard of review were de novo, perhaps there would be a genuine issue of material fact as to whether chemical imbalances which lead to depression are 'physical' or 'mental' disorders." *Id.*

■■■ It is the opinion of the Court that the language of the policy at issue in the present case is distinguishable from the language in *Parker, Phillips,* and *Lang.* Here, the policy defines the term "mental illness" and that definition specifically includes depression and "mental or emotional disorders of any kind including those caused by chemical imbalance." Thus, there can be no doubt that the policy limits the coverage period for disabilities resulting from depression or any other emotional or mental disorder caused by chemical imbalance. As such, the Court sees no ambiguity in those terms in the present policy. This Court "will 'not artificially create ambiguity were [sic] none exists. If a reasonable interpretation favors the insurer and any other interpretation would be strained, no compulsion exists to torture or twist the language of the policy.'" *Id.* (citing *Evans v. Safeco Life Ins. Co.,* 916 F.2d 1437, 1441 (9th Cir.1990)).

The Court notes that Plaintiffs additionally contend that the term "organic brain syndromes" is ambiguous. While it is true that the term is not defined in the policy or in the DSM–IV, the term is defined in the International Classification of Diseases ("ICD–9"), the coding system recommended for use in all clinical settings by the World Health Organization and required for reporting diagnoses and diseases to all United States Public Health Service and Health Care Financing Administration Programs. *See* International Classifications of Diseases §§ 310.0–310.9 (9th Ed.1998) (organic brain syndrome is also known as "organic brain damage"). A definition of organic brain syndromes also appears in 5 Robert K. Ausman and Dean E. Snyder, Ausman & Snyder's Medical Library Lawyers Edition § 8.49, at 431–32 (1990 & Supp.2000).

■■■ In the Court's opinion, the instant policy is not ambiguous simply because it does not define specific disorders therein, such as organic brain syndromes,

---

7. The Sixth Circuit later reversed en banc the panel's holding as to Parker's claim under Title III of the Americans with Disability Act. *See Parker v. Metropolitan Life Ins. Co.,* 121 F.3d 1006, 1009 (6th Cir.1997). Neither party had sought rehearing as to the disposition of Parker's ERISA claim. *See id.* at 1009 n. 1.

8. Under the *Parker* plaintiff's plan, persons who are deemed to be totally disabled due to "a mental or nervous disorder" can receive benefits for up to twenty-four months. At the end of twenty-four months, benefits continue only if the person if hospitalized or institutionalized. 99 F.3d at 184.

neurosis, or psychosis, whose definitions may be readily obtained by consulting the DSM–IV, ICD–9, or a medical dictionary. Further, because the Court finds that Campbell suffers from Major Depressive Disorder rather than Organic Mood Disorder Due to a General Medical Condition, *see infra* IV(B)(2), the Court need not determine whether Organic Mood Disorder is synonymous with Organic Brain Syndrome. Ambiguity only exists if one of the reasonable interpretations of a policy term results in coverage while the other results in exclusion. *See Luton,* 88 F.Supp.2d at 1370. Even if "organic brain syndrome" has two or more reasonable interpretations, here no interpretation would result in coverage because Campbell suffers from depression, which is unambiguously excluded from lifetime coverage under the policy.

2.

■ Having found the policy language to be unambiguous, the Court shall proceed with its de novo review of the plan administrator's determinations. The plan administrator found that "there is a lack of medical evidence to support the position that [Campbell] may suffer from organic brain syndrome or organic mood disorder. Instead, the medical information submitted in support of Mr. Campbell's appeal, including a long standing history of depression, tends to show that he suffered from a mental illness as that term is defined in the policy." (Attachs. to Docket Entry No. 28). Based upon the evidence in the administrative record, which the Court has thoroughly reviewed, the Court agrees with Fortis' determination that Campbell is not entitled to long term disability benefits under the terms of the policy. Applying the de novo standard of review, the Court finds that the evidence in the record establishes that Campbell suffers from Major Depressive Disorder, a special condition under the unambiguous terms of the plan, and therefore Campbell is not entitled to disability benefits beyond one year.

Like Fortis, we reject Campbell's contention, based solely upon the opinion of Dr. Judith Akin, that the "mental illness" from which Campbell suffers is "Organic Mood Disorder," a finding that Campbell asserts would remove his claim for benefits from the twelve-month "special condition" benefit limitation due to its organic origin. While the evidence supports the presence of a general medical condition (hypothyroidism), it does not establish to the Court's satisfaction that Campbell's mood disorder is etiologically related to his hypothyroidism. While Dr. Akin opines that it is "rather straight forward" that Campbell's mental illness initially resulted from hormonal imbalances in his body (AR 0646), *all* other health care professionals who examined Campbell and/or his medical records were unable or unwilling to draw this same conclusion. For instance, Independent Medical Examiner Dr. Bernet, after examining Campbell in person for 2.6 hours and reviewing his medical and prescription records, concluded that Campbell's hypothyroidism and depression should be conceptualized as two separate conditions, "with the hypothyroidism at times aggravating the depression." (AR 0676). Dr. Bernet based his conclusion that Campbell's depression and thyroid problems are two independent illnesses on several credible reasons: Campbell's strong family history of depression and the cyclic nature of Campbell's depressive episodes, which are indicative of a Major Depressive Disorder; that Campbell experienced significant episodes of depression at least ten years prior to the time he was diagnosed his hypothyroidism; and that even while his hypothyroidism problem is under control, Campbell still suffers from depression.

Likewise, peer reviewer Dr. Mark Moyer, though noting that Campbell's hypothyroidism undoubtedly exacerbated his depression, opined that Campbell suffered from three unrelated disorders—endocrine, emotional, and laryngeal. (AR 0374). Dr. Moyer concluded that because Campbell's thyroid problems were under control with medication, "it is extremely unlikely that [his] continued signs of depression

and mood disorder or associated coping disorder can be attributed to an endocrinologic disorder." (*Id.*). Further, he noted, "If all of Mr. Campbell's evident mood disorder and psychiatric conditions were due to hormonal deficiencies, then it would seem likely that his medication could be withdrawn rather than being additionally prescribed." (AR 0354).

Psychiatrist and peer reviewer Dr. Reginald Givens found that while the records support a relationship between Campbell's hypothyroid and depressive symptoms, his depression likely preceded his hypothyroidism since Campbell continued to exhibit depressive symptomatology despite his thyroid levels being fairly normal. (AR 0351–52). Similarly, endocrinologist and peer reviewer Dr. Jay Sher recognized a relationship between Campbell's thyroid problems and depression, but ultimately found that his mood disturbance "cannot be blamed totally on his endocrine problems" as his mood disturbance persisted even after his thyroid functions normalized. (AR 0358).

Doctors Chanin, Houston, Jenkins, and Stein referenced or treated Campbell's depressive disorder but did not link his depression with his hypothyroidism or any other general medical condition. Specifically, Dr. Chanin administered a test to Campbell and found that he met DSM–IV diagnostic criteria for Major Depression (AR 0130); Dr. Houston noted that Campbell's thyroid problems were under control but his depressive symptoms persisted (AR 0208); Dr. Jenkins noted Campbell's "long history of refractory depression" (AR 0405); and Dr. Stein acknowledged Campbell's medical history was significant for depression (AR 0052).

Dr. Akin provides the *only* medical diagnosis in the Administrative Record of Organic Mood Disorder Due to a General Medical Condition and the *only* medical opinion asserting that Campbell's depressive symptoms are the direct physiological consequence of his hypothyroidism. Unlike the majority of the other medical professionals in the record, Dr. Akin does not discuss Campbell's depressive symptoms dating back to the early 1980's or his family history of depression. More importantly, however, Dr. Akin does not explain why she diagnosed Campbell's condition as Mood Disorder Due to a General Medical Condition rather than Major Depressive Disorder when his depression preceded his diagnosis of hypothyroidism by ten years and persisted even while his hormonal levels were normalized.

Plaintiffs contend that the Court should give the testimony of Dr. Akin greater weight because she is Campbell's treating physician. The Sixth Circuit has not addressed whether the "treating physician rule" applies in ERISA cases as it does in social security disability cases. However, other circuits have rejected the application of the "treating physician rule" to ERISA cases. *See Conley v. Pitney Bowes,* 176 F.3d 1044, 1049 (8th Cir.1999) ("the rule is not that a treating physician's opinion trumps all other evidence but that a court must give it appropriate weight"); *Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.,* 32 F.3d 120, 126 (4th Cir.1994) ("To require the Plan to give conclusive weight to the opinion of the treating physician would deprive it of its role in determining medical necessity."); *Salley v. E.I. DuPont de Nemours & Co.,* 966 F.2d 1011, 1016 (5th Cir.1992) (voicing "considerable doubt about holding the rule applicable in ERISA cases"); *Jett v. Blue Cross & Blue Shield of Alabama, Inc.,* 890 F.2d 1137, 1140 (11th Cir.1989) ("the Social Security law that greater weight must be given to the opinion of the treating physician is not applicable to the decision of the claims administrator of an ERISA-governed employee health plan where the treating physician has an economic interest in the matter").

The Court joins the growing majority of courts holding that the "treating physician rule" does *not* apply in ERISA-governed cases. As the Fifth and Eleventh Circuits have specifically noted, application of the rule is fraught with con-

flict of interest issues, particularly if the treating physician stands to profit if the Court found that benefits should not be terminated. *See Salley,* 966 F.2d at 1016; *Jett,* 890 F.2d at 1140. As one district court recently explained: "It is not unreasonable ... for a plan administrator to give greater weight to its own consultants' determinations than to the recommendations of the beneficiary's own doctor. Deference is due even if the plan administrator's medical consultant relied exclusively on 'cold' medical records and reports, rather than opinions of doctors who treated the beneficiary first-hand." *Marsteller v. Life Ins. Co. of North America,* 24 F.Supp.2d 593, 596 (W.D.Va.1998) (internal citation omitted). Thus, Plaintiffs' contention that Fortis and the Court are required to accept Dr. Akin's opinion primarily or exclusively because she is Campbell's treating physician must fail.

▇▇ The Court, as did Fortis, must consider all of the evidence contained in the Administrative Record when determining whether Campbell is eligible for benefits. In so doing, the Court finds that the evidence in the record supports a diagnosis of Major Depressive Disorder not Mood Disorder Due to a General Medical Condition, as the medical history, laboratory findings, and physical examinations indicate that Campbell's depressive symptoms are not the direct physiological consequence of his hypothyrodism.

Therefore, the Court finds that Fortis' interpretation of the disability definition in the policy was correct.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Partial Summary Judgment (Docket Entry No. 34), construed by the Court as a motion for entry of judgment reversing the plan administrator's decision, is hereby DENIED. However, Defendant's Motion to Deny Relief and to Affirm the Plan Administrator's Decision to Deny Benefits (Docket Entry No. 37) is hereby GRANTED. Accordingly, judgment shall be entered in favor of Defendant Fortis

Benefits Insurance Company with respect to Plaintiffs' ERISA claim for disability benefits brought under 29 U.S.C. § 1132.

## *ORDER*

Presently pending before the Court is Plaintiffs' Motion for Partial Summary Judgment (Docket Entry No. 34), to which Defendant has responded in opposition. Also pending is Defendant's Motion to Deny Relief and to Affirm the Plan Administrator's Decision to Deny Benefits (Docket Entry No. 37), to which Plaintiffs have responded in opposition. For the reasons explained in the Memorandum entered contemporaneously herewith, Plaintiffs' Motion, construed by the Court as a motion for entry of judgment reversing the plan administrator's decision, is hereby DENIED. However, Defendant's Motion is hereby GRANTED. Accordingly, judgment shall be entered in favor of Defendant Fortis Benefits Insurance Company with respect to Plaintiffs' ERISA claim for disability benefits brought under 29 U.S.C. § 1132.

It is so ORDERED.